Rel: February 10, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

_____

### CR-2022-0521

_____

**State of Alabama**

**v.**

**William Ray Norris**

**Appeal from Clarke Circuit Court**
**(CC-22-2)**

McCOOL, Judge.

The State of Alabama appeals the Clarke Circuit Court's judgment dismissing an 11-count indictment against William Ray Norris. For the reasons set forth herein, we reverse the judgment and remand the case for the circuit court to reinstate the indictment.

Facts and Procedural History

In January 2019, Norris began serving a term as the Clarke County sheriff. In April 2021, the State filed in the Alabama Supreme Court an information of impeachment and prayer for ouster, alleging that Norris had engaged in corruption in office and had committed offenses involving moral turpitude. Generally, the corruption charge alleged that Norris had used his public office for personal gain, and the moral-turpitude charge alleged that he had made intentional misrepresentations in certain financial-disclosure forms he was required to file as a public official and that he had willfully failed to report taxable income to the State of Alabama for 2019. An initial hearing in the impeachment proceeding was scheduled to occur on June 2, 2021, but the impeachment proceeding was rendered moot when Norris tendered his resignation on May 25, 2021, to become effective on June 1, 2021.

In January 2022, a Clarke County grand jury returned an indictment charging Norris with five counts of conversion of campaign contributions to personal use, see § 36-25-6, Ala. Code 1975; two counts of an intentional violation of the Fair Campaign Practices Act, see § 17-5-1 et seq., Ala. Code 1975; one count of the use of public office for

personal gain, see § 36-25-5, Ala. Code 1957; two counts of intentional failure to make certain financial disclosures in his 2019 statement of economic interests, see § 36-25-14, Ala. Code 1975; and one count of a willful attempt to evade paying Alabama income tax, see §§ 40-18-2 and 40-29-110, Ala. Code 1975.

Norris subsequently filed a motion to dismiss the indictment, in which he alleged that he and the State had "entered into an agreement, where in return for [his] resign[ation] as the Sheriff of Clarke County, the State would dismiss the impeachment case …, and the State would not bring or pursue criminal charges against [him]." (C. 40.) In support of his motion, Norris cited Ex parte Yarber, 437 So. 2d 1330, 1335 (Ala. 1983), for the proposition that the State may not enter into a plea agreement with a defendant and then "be allowed to repudiate that agreement with impunity." Norris included with his motion an affidavit from attorney Joe Espy III, who claimed to have represented Norris during the pendency of the impeachment proceeding. In his affidavit, Espy stated that, while the impeachment proceeding was pending, he and Clark Morris, the Assistant Chief Deputy Attorney General, had reached a "verbal understanding" that, if Norris would resign as sheriff, no

"criminal charges would be brought against him," and, according to Espy, Norris had tendered his resignation "based upon [that] agreement." (C. 45.)

The State filed a response to Norris's motion, arguing that the alleged agreement "was never made and is a matter of complete fiction." (C. 62.) In addition, the State argued that, even if Morris had entered into the alleged agreement, it was invalid and therefore unenforceable. In support of that argument, the State noted that Norris's discussion of plea agreements was inapposite because, the State said, Norris was "alleging, in essence, that he was granted … immunity by the State," not that he had entered into a plea agreement with the State. (C. 100.) According to the State, this distinction is important because, the State said, in Alabama an immunity agreement must be signed by the prosecutor, must be approved by a judge, and must be granted in exchange for truthful testimony as a State's witness against another accused of a crime. Thus, because it is undisputed that those requirements were not satisfied, the State argued that Norris faced a "legal obstacle" that precluded dismissal of the indictment. (Id.)

4

The circuit court held a hearing on Norris's motion and heard testimony from Espy and Morris, who each testified as to their conversations regarding Norris. The first two conversations occurred on May 24, 2021 – the day before Norris tendered his resignation – and Espy testified that there was "no question in [his] mind" that he and Morris had reached an agreement during those brief conversations. (R. 29.) Regarding the terms of that agreement, Espy testified:

> "The agreement was that if Norris would resign his office as sheriff, that would conclude any state criminal prosecution. [Morris] made it very clear that the federal folks were still investigating and [the agreement] did not include that. It included only the state charges going forward. I relayed this to Norris. He directed me to proceed and accept it, and I told Morris that we agreed and we accepted it and we went forward."

(R. 30.) The next day, Norris tendered his resignation, and, according to Espy, Norris "wouldn't have filed [his resignation] but for the agreement with Morris." (R. 72.)

The next conversation occurred in January 2022, after Espy learned that Norris had been indicted. Regarding that conversation, Espy testified:

> "I … told [Morris] that I had been informed that there had been an indictment against Norris in Clarke County. She said I'm correct.

5

> "And … I can't remember verbatim what was said, but I basically said to her – and I was upset, understand, I was not happy. Okay? And I told her that was basically contrary to the agreement we made. She responded, 'Circumstances changed.'
>
> "And I said, you know, I represented … to Norris … that this matter had been resolved pursuant to that agreement, and this puts me in a box.
>
> "She said, 'I understand.'
>
> "I said, 'Going forward, this changes mine and your relationship.'
>
> "And she said, 'I understand.' She didn't say we miscommunicated or anything. She said, 'Circumstances changed.' She did not tell me what they were."

(R. 50-51.) Espy testified that he had spoken with Morris again approximately one week later and had asked her to tell him "what the circumstance was that changed," but, according to Espy, Morris "didn't answer that question" and, instead, had told him that she would "make it up to [him] down the road, or something to that effect." (R. 52.)

Morris testified as follows regarding her May 24, 2021, conversations with Espy:

> "It was during those conversations that [Espy] told me that Norris was going to resign. I explained to him that our plan … was for us, being the State of Alabama, to handle the

6

impeachment and for the federal government or the U.S. Attorney's Office to handle the prosecution of Norris.

"But I have to say, Judge, there was no agreement; there was no offer; there was no acceptance; there was no bargain. It was our plan. And I shared that with [Espy] mainly because I had worked with him so much, I felt comfortable sharing the plan with him. But as we all know, plans change from time to time.

"....

"It was a plan. It wasn't an agreement .... I was just explaining to him what we were planning to do with the case ...."

(R. 96-97.) In further support of her contention that no agreement existed, Morris noted that Norris's resignation was effective June 1, 2021, approximately one week after she had allegedly entered into the agreement. According to Morris, that fact indicated that Norris had made the decision to resign "on his own," not as a result of any agreement with the State, because, she testified, "if there were a bargain, [she] ... wouldn't let a sheriff that [she] considered corrupt stay in office for an extra week." (R. 108.)

As for the reason the State had changed its "plan" not to prosecute Norris, Morris testified that a United States attorney in the Southern District of Alabama had assured her that Norris would be indicted in

7

federal court in June or July of 2021, but, according to Morris, that never happened. Morris testified that she had spoken with the United States attorney in August 2021 in an attempt to "push [him] to go ahead and indict" Norris (R. 111) and that the attorney had assured her he "should be able to get th[at] done in September or October." (R. 115.) However, as of December 2021, Norris had not been indicted in federal court, so Morris "started thinking [the State was] going to have to get it done" (id.), and Norris was indicted in January 2022.

As to the conversations that occurred following Norris's indictment, Morris testified that Espy "never mentioned … any type of agreement or … a deal or anything like that." (R. 117.) Instead, Morris testified, Espy "just wanted to know what had changed and why [the State] had indicted Norris" (id.), and she testified that she had explained to Espy that, because "the feds didn't do their job," the State "[was] having to take care of it now." (R. 118-19.)

Following Morris's testimony, Espy returned to the witness stand and testified as follows:

> "Q. … [Y]ou heard [Morris] say that she told you basically the same thing you say she said, but she said it was a plan as opposed to an agreement. Tell the Court your best recollection of that conversation again.

8

"A. Judge, [Morris] ain't never told me a plan in that office. There wasn't anything about a plan. She represented to me without question on May 24 that … if [Norris] resigned, there would be no state charges …."

(R. 156-57.)

On March 23, 2022, the circuit court issued an order dismissing the indictment with prejudice. The circuit court did not base its ruling on a finding that Espy and Morris had reached an agreement that the State would not prosecute Norris in exchange for his resignation. Instead, the circuit court found that Espy and Morris had "both testified absolutely truthfully" (C. 140) and simply "had a different understanding of [the May 24, 2021,] conversation[s]." (C. 139.) The circuit court concluded that dismissal of the indictment was warranted, however, because it found that Espy and Norris reasonably believed the agreement existed and that Norris had relied on that belief to his detriment by resigning as sheriff. The State filed a timely notice of appeal.

## Standard of Review

Generally, a circuit court's ruling on a motion to dismiss an indictment is reviewed for an abuse of discretion. Burt v. State, 149 So. 3d 1110, 1112 (Ala. Crim. App. 2013). However, when the circuit court's

9

ruling is based on a question of law, this Court applies a de novo standard of review.  Id.

## Discussion

On appeal, the State claims that the circuit court erred by dismissing the indictment against Norris.  In support of that claim, the State disputes the allegation that Morris agreed not to prosecute Norris in exchange for his resignation but argues that, even if she did, the agreement was an invalid and therefore unenforceable transactional-immunity agreement.  In response, Norris argues that the alleged agreement was not an immunity agreement and instead refers to it as a plea agreement, as he did below.  Because the parties disagree as to the nature of the alleged agreement and because "plea agreements and immunity agreements 'differ markedly,'" Lampkins v. Commonwealth, 44 Va. App. 709, 723, 607 S.E.2d 722, 729 (2005) (quoting Plaster v. United States, 789 F.2d 289, 293 (4th Cir. 1986)), we begin our analysis by explaining what the alleged agreement was, and what it was not.

Rule 14.3(a), Ala. R. Crim. P., which governs plea agreements, provides that the State and a defendant

> "may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty to a

10

> charged offense or to a lesser or related offense, the prosecutor either will move for dismissal of other charges or will recommend (or will not oppose) the imposition or suspension of a particular sentence, or will do both."

In other words, a plea agreement typically arises only after a criminal charge has been filed, and the agreement requires that the defendant enter a plea of guilty to that charge or another (usually less serious) charge, which results in a conviction, in exchange for some concession by the State that the defendant finds satisfactory. See also State v. Johnson, 360 S.W.3d 104, 110 (Ark. 2010) ("A 'pure plea bargain agreement' involves '"a suspect who has been apprehended for allegedly committing a crime and, rather than face the prospects of an extended trial and a punishment of undetermined severity if convicted, decides to plead guilty to charges mutually acceptable to him and the prosecutor."'" (quoting State v. Howe, 2 Neb. App. 766, 772, 514 N.W.2d 356, 361 (1994), quoting in turn United States v. Minnesota Min. & Mfg. Co., 551 F.2d 1106, 1111-12 (8th Cir. 1977))); and Custer v. State, 86 Md. App. 196, 199, 586 A.2d 51, 53 (1991) ("Traditionally, a 'plea bargain' or 'plea agreement' contemplates a conditional plea of guilty … to one or more pending charges." (quoting Gray v. State, 38 Md. App. 343, 356, 380 A.2d 1071 (1977))).

A transactional-immunity agreement, on the other hand, typically arises when a person suspected of a crime agrees to testify as a State's witness against another person accused of a crime, and, in return, the State agrees that the witness will not be prosecuted for any crimes related to the events about which he testifies. See State v. Belanger, 146 N.M. 357, 361, 210 P.3d 783, 787 (2009) ("Transactional immunity involves a promise by prosecutors that a witness will not be prosecuted for crimes related to the events about which the witness testifies."); In re Tracy L., 10 Cal. App. 4th 1454, 1463, 13 Cal. Rptr. 593, 598 (1992) (defining transactional immunity "as that kind of immunity which 'immunizes the defendant from prosecution for any offense which is implicated by [his] testimony'" (quoting People v. Campbell, 137 Cal. App. 3d 867, 874, 187 Cal. Rptr. 340, 343 (1982))); and In re Caito, 459 N.E.2d 1179, 1182-83 (Ind. 1984) ("[T]ransactional immunity … prohibits the State from criminally prosecuting the witness for any transaction concerning that to which the witness testifies[.]"). Unlike a plea agreement, a transactional-immunity agreement does not require pending charges, does not require the person receiving immunity to enter a guilty plea, and does not result in a conviction. To the contrary, "'"the

very nature of [a transactional-immunity] agreement is the promise on the part of the government to do nothing."'" <u>Johnson</u>, 360 S.W.3d at 110 (quoting <u>Lampkins</u>, 44 Va. App. at 724, 607 S.E.2d at 729, quoting in turn <u>Plaster</u>, 789 F.2d at 293)).

In this case, the alleged agreement arose before the State had filed any criminal charges against Norris, and it allegedly provided that the State would not file any charges against him if he resigned his position as sheriff, which he did. Thus, if the alleged agreement is to be enforced, the effect will be that the State can never prosecute Norris for the offenses charged in the indictment, i.e., that the State can "do nothing" to Norris with respect to those offenses. <u>Johnson</u>, 360 S.W.3d at 110 (citations omitted). We agree, then, with the State's argument that the alleged agreement cannot be classified "as anything other than a grant of 'transactional immunity'" (State's reply brief, pp. 2-3), and other courts have reached the same conclusion.[1] <u>See</u> <u>Johnson</u>, 360 S.W.3d at 111 (holding that the prosecutor's agreement that he would "not file formal charges if [the appellant] would obtain a psychiatric evaluation" was an

---

[1]The circuit court also appears to have concluded that the alleged agreement was an immunity agreement. (R. 173.)

13

"'informal immunity'" agreement and was "clearly not" a plea agreement (quoting Howe, 2 Neb. App. At 773, 514 N.W.2d at 362)); State v. Ralston, 43 Kan. App. 353, 363, 225 P.3d 741, 750 (2010) (holding that, contrary to the appellant's argument, an alleged agreement whereby he would not be prosecuted in exchange for his cooperation with the State was an immunity agreement and not a plea agreement); United States v. Bailey, 34 F.3d 683, 690 (8th Cir. 1994) ("[T]he essence of a nonprosecution agreement is a promise of immunity."); United States v. Jimenez, 256 F.3d 330, 347 (5th Cir. 2001) (noting that an agreement not to prosecute and an immunity agreement are "in essence" the same); United States v. Bird, 709 F.2d 388, 392 (5th Cir. 1983) ("While the agreement is phrased in terms of nonprosecution, its essence is a promise of immunity."); United States v. Skalsky, 857 F.2d 172, 175 (3d Cir. 1988) (noting that "agreements not to prosecute" are "[i]nformal grants of immunity"); and Neal v. Director, D.C. Dep't of Corr., 400 F. Supp. 2d 134, 143 (D.D.C. 2005) (noting that an "'agreement not to prosecute'" is the "'fundamental equivalent'" of an immunity agreement (quoting Jaggers v. United States, 482 A.2d 786, 797 (D.C. 1984))).

14

Having determined that any agreement that arose in this case was an immunity agreement, we turn to the State's argument that the alleged immunity agreement is invalid and thus unenforceable. In State v. Sealy, 728 So. 2d 657, 661 (Ala. Crim. App. 1997), this Court noted that "Alabama is one of a number of states that do not have a general statute authorizing prosecuting attorneys to grant immunity from prosecution." However, despite the lack of such a statute, "prosecuting attorneys and judges are not forbidden from granting an accused immunity from prosecution for criminal offenses," and "[n]onstatutory grants of immunity can be valid in Alabama if they follow the guidelines established in Ex parte Graddick, [501 So. 2d 444 (Ala. 1986)], i.e., the grant of immunity must be signed by the district attorney and approved by the trial judge." Sealy, 728 So. 2d at 661.

In this case, it is undisputed that the alleged immunity agreement was not signed by Morris (indeed, it was not reduced to writing) and that it was not judicially approved (indeed, it was never presented to a judge). Thus, we agree with the State's argument that the alleged agreement was not a valid immunity agreement. Ex parte Graddick, supra. Consequently, even if the alleged immunity agreement existed, it is not

15

legally enforceable and therefore does not entitle Norris to dismissal of the indictment. See Sealy, 728 So. 2d at 661 (holding that an invalid promise of immunity "was not binding upon the [S]tate, and the [S]tate was not estopped from raising its invalidity nor estopped from indicting or prosecuting [the appellant]"; "'[b]reach of such a promise … cannot be pled in bar of an indictment'" or "'as grounds for dismissal of the prosecution'" (quoting Yarber v. State, 368 So. 2d 868, 869-70 (Ala. Crim. App. 1978))); and State v. Seneca, 726 So. 2d 748, 750 (Ala. Crim. App. 1998) (same).

We recognize that Norris argued below that, as a matter of equity, the State should be estopped from prosecuting him based on Morris's alleged oral assurance that he would not be prosecuted if he resigned as sheriff. As the State notes, however, "'Alabama has not embraced the estoppel theory to uphold non-statutory grants of immunity'" that are not valid. Sealy, 728 So. 2d at 661 (quoting Mayberry v. State, 419 So. 2d 262, 265 (Ala. Crim. App. 1982)). Of course, that is not to say that we cannot embrace the estoppel doctrine now, but this Court has previously noted that application of "the estoppel theory" would require proof that the accused had acted to his detriment based on "an explicit" and

16

"<u>unambiguous</u> offer of immunity." <u>Mayberry</u>, 419 So. 2d at 265 (emphasis added). And it is the accused seeking application of the estoppel doctrine who bears the burden of demonstrating that the State made an explicit and unambiguous offer of immunity. <u>See</u> <u>United States v. Rosario</u>, 237 F. Supp. 2d 242, 245 (E.D.N.Y. 2002) (noting that the party claiming immunity by estoppel has the burden of proving that there was "a 'clear and unambiguous' promise" of immunity (quoting <u>Readco, Inc. v. Marine Midland Bank</u>, 81 F.3d 295, 301 (2d Cir. 1996))); and <u>United States v. Short</u>, 387 F. App'x 308, 313 (4th Cir. 2010) (not selected for publication in the Federal Reporter) (noting that, for the doctrine of "'equitable immunity'" to apply, "the defendant bears the burden of proving the existence of an equitable immunity agreement").

In this case, the circuit court did not find that Morris had made an explicit and unambiguous offer of immunity, and this Court cannot make that finding because doing so would require us to make credibility determinations with respect to Espy's and Morris's testimony, which are wholly outside the scope of our review. <u>Albarran v. State</u>, 96 So. 3d 131, 198 (Ala. Crim. App. 2011). Instead, the circuit court found that Espy and Morris had "a different understanding" of their conversations and

17

that Norris reasonably <u>believed</u> that Morris had offered him immunity in exchange for his resignation. However, Norris's mere <u>belief</u> that he had been granted immunity is not a sufficient basis upon which to apply the estoppel doctrine unless that belief was based on an explicit and unambiguous offer of immunity. Thus, because the circuit court did not find that Morris had made an explicit and unambiguous offer of immunity, the estoppel doctrine does not justify dismissal of the indictment. <u>See</u> <u>Mayberry</u>, 419 So. 2d at 265 (holding that the State was not estopped from prosecuting the appellant, who believed that the district attorney had granted him immunity, because, although the district attorney had made statements <u>implying</u> that the appellant might obtain immunity in return for his cooperation, the district attorney had not made "an <u>unambiguous</u> offer of immunity" (emphasis added)). <u>See also</u> <u>Jimenez</u>, 256 F.3d at 348 n.25 ("[The defendant's] subjective belief [that he would not be prosecuted] cannot, by itself, establish transactional immunity."); and <u>United States v. Weiss</u>, 599 F.2d 730, 738 (5th Cir. 1979) ("[T]he appropriate analysis is not whether [the defendant] subjectively expected not to be prosecuted but whether there

18

was a promise held out to which the government, as a matter of fair conduct, might be bound.").

## Conclusion

Based on the foregoing, the circuit court erred by granting Norris's motion to dismiss the indictment. Thus, we reverse the judgment of dismissal and remand the case to the circuit court for that court to reinstate the indictment.

REVERSED AND REMANDED.

Windom, P.J., and Kellum, Cole, and Minor, JJ., concur.