# CHARLES REED BUTLER v. STATE OF MARYLAND

[No. 1599, September Term, 1982.]

*Decided July 13, 1983.*

410

The cause was argued before Gilbert, C. J., and Moylan and Alpert, JJ.

*David P. Sutton, Assigned Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Deborah K. Chasanow, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Stephen J. Braun, State's Attorney for Charles County,* and *Leonard Collins, Assistant State's Attorney for Charles County,* on the brief, for appellee.

Moylan, J., delivered the opinion of the Court.

At its most fundamental level, the problem is that lines that should be drawn with precision are being, carelessly or deliberately, blurred. A blurred fact pattern begets a blurred issue; a blurred issue begets a blurred appellate decision; a blurred appellate decision begets more blurred issues *ad infinitum.*

The single, but exasperatingly diffuse, claim of the appellant, Charles Reed Butler, is that he somehow made a deal, more or less, with a couple of policemen; that pursuant to

that deal, he somehow performed, more or less; and that if the judicial branch does not intervene (whether it has such sweeping power or not) to bar forever his prosecution in the Circuit Court for Charles County for armed robbery, we are all heading straight for the Gulag Archipelago.

In the teeth of such cosmic considerations, mere technicalities such as (1) whether the party ostensibly representing the State had the power to make a binding agreement; (2) what binding agreements anyone representing the State is authorized to make; (3) what were the precise terms of the agreement; (4) did the appellant breach the agreement by inadequate performance; (5) who has the burden of proof with respect to all of the above issues; (6) who shall be commissioned to judge the adequacy of such performance; (7) are such agreements enforceable in the criminal courts or only in equity; and (8) what, if any, sanctions are available to the reviewing judge, are dismissed as things that pedants fuss about. The appellant demands simply that rough justice be done.

Because this homespun plea of "It just ain't right," unknown to Coke or Blackstone, is becoming increasingly disturbing to increasingly sensitive judicial antennae, some precision, of language and of thought, in this murky business is called for. It is important that we identify precisely what the present claim involves. It is perhaps even more important that we identify what the present claim does not involve.

### The Present Case

The appellant was convicted in the Circuit Court for Charles County by Judge George W. Bowling, sitting without a jury, of (1) armed robbery, (2) assault with intent to disable, (3) false imprisonment, and (4) the use of a handgun in the commission of a felony. He received a sentence of twenty-five years imprisonment. Upon this appeal, he makes no claim that his trial was flawed in any respect. His claim rather is that he asserted a valid plea in bar to the

very bringing of the prosecution and that the dismissal of that plea was in error.

The armed robbery that gave rise to this case occurred on July 1, 1981 at Earle's Truck Stop in Bel Alton, Charles County, Maryland. Investigating that armed robbery, perpetrated by a number of assailants, were Investigators Rex Coffey and J. T. Hindle, of the Vice Intelligence Section of the Charles County Sheriff's Department. In some unspecified fashion, suspicion focused on the appellant. On July 9, eight days after the robbery, a very tentative conversation occurred between Investigator Coffey and the appellant. The appellant was not in custody and makes no claim in that regard. As a result of the first tentative conversation, a second conversation ensued. The two investigating officers agreed not to charge the appellant if the appellant gave them a truthful statement revealing his total knowledge of the armed robbery. The agreement (a model of imprecision) between the two investigators and the appellant was reduced to writing and became a key exhibit in the case. It provided:

> "We, Rex Coffey and J. T. Hindle, do promise that we will not charge Charles Reed Butler for the crime of Armed Robbery on the condition that Charles Reed Butler gives a statement of truth of all knowledge of the crime of the Armed Robbery of Earle's Truck Stop."

Pursuant to that agreement, the appellant gave a statement to the police on July 10. The heart of his narration was as follows:

> "On Monday night about 9:00 Larry Lucas called me and said he had a deal lined up. He asked me if I wanted to make a thousand dollars. All I had to do was let a couple of guys stay in my tool shed for a little while. He said four guys. On Tuesday night he called me again and told me to meet him over at Rolling Hills at 2:00 a.m. I went to Rolling Hills that night and Larry Lucas and the four other guys were already there. He told me then that they were

going to rob Earle's Truck Stop between four and five o'clock that morning. He said all I had to do is wait at the end of my driveway and when he dropped the guys off I was to take them up to my tool shed and hide them there and then between 6:30 and 7:00 someone else would pick them up. So I said O.K. I told him when I left there I was going to stop by Earle's and check it out. I wanted to see what it looked like for my own self. I went back home and stayed until about 4:30 a.m. that morning. Then I went down to the road and stayed about forty-five minutes until he came along. When he came by the turn he kept right on going. About a half mile behind him was another car. When he went by me I went on up to the house because I didn't know what was going on. A few seconds later I heard tires squealing. I don't know what happened. I went in and was setting at the table having some coffee and about a half hour later Larry Lucas knocked at my door. He told me the guys were in the tool shed. He said someone would be there within an hour to pick them up. About an hour later a brown car with Virginia tags pulled up in the driveway. The guys got in the car and left."

Several pages of additional questions and answers provided little by way of amplification. The appellant did describe Larry Lucas' automobile. The appellant could not identify the five persons who were the robbers except to say that he had heard "one of them call the name Freddie or Eddie, I think it was Eddie." The appellant acknowledged only the receipt of $300 from the robbery, paid to him by Larry Lucas "the next day about 6 p.m. or 6:30 p.m." The appellant claimed that the money he received consisted simply of rolls of quarters.

The information independently developed by the police revealed the appellant's statement to have been significantly false and massively incomplete. Included in the money taken in the course of the armed robbery was $1,000

in Susan B. Anthony silver dollars. Notwithstanding the appellant's claim that he had obtained only rolls of quarters, his stepdaughter testified that during the first week of July, 1981, she had received five Susan B. Anthony silver dollars from the appellant and her sister, Valerie, had received five Susan B. Anthony silver dollars as well. The appellant, moreover, accompanied the gift with the admonition, "Don't spend them here. You will get in trouble for them."

The appellant's wife informed the two investigators, as she later testified at the appellant's trial, that on the day before the robbery, the appellant said to her, "Puggy, what would you do with $20,000?" When the wife asked the appellant if he was going to get a bank loan or something like that, he responded, "No. Don't be so dumb. All it takes is 48 hours." She further revealed that the appellant told her not to worry "if I don't come home that night; don't worry about him because he would be OK." She further revealed that the appellant was gone all night on the night of June 30-July 1, the night of the robbery. She did see him the next day when he came home in a station wagon but shortly thereafter left again in an ice cream truck that he owned.

On September 9, the two investigators took a statement from one Timothy Hicks. Mr. Hicks had known the appellant all of his life. Mr. Hicks stated that it was the appellant who first broached the subject of armed robbery, inquiring whether Hicks "knew someone that wanted to make some quick money." Hicks became the intermediary who ultimately put the appellant in touch with the three triggermen who were from the Landover area of Prince George's County. Mr. Hicks drove with the appellant to Landover to make the contact. On the night of the actual robbery of Earle's Truck Stop, Hicks rode with the appellant, the three triggermen, and Larry Lucas as they drove past the truck stop for a preliminary casing of it. Mr. Hicks then left the others and did not participate directly in the robbery. The appellant had told him, however, that "he would take care of him later."

Two of the actual triggermen, Jerome Darryl

Cunningham and Donald Raithel Grey, first gave statements to the investigators and later, pursuant to a plea bargain, testified as State's witnesses at the appellant's trial. Both witnesses revealed that they were introduced to the appellant a day or two before the robbery, that the appellant recruited them to carry out the robbery, that the appellant was familiar with Earle's Truck Stop and described the circumstances to them in detail, that the appellant reassured them that the surveillance camera in the truck stop had been turned off, and that the appellant supplied them with gloves and with rope for tying up the robbery victim. They both revealed that the appellant drove them to Earle's Truck Stop on the night of the robbery, passing by it for a preliminary view, stopping to go over again the details of the robbery, and finally returning for the robbery itself. They revealed that the appellant and Larry Lucas remained in Lucas' car, while the three triggermen went in and perpetrated the robbery. They revealed that the appellant led them to a small shed on his own property where they remained in hiding for several hours. They revealed further that it was the appellant who directed them to get into his Good Humor truck, in which he drove them back to Prince George's County on the day after the robbery.

The massive evidence of the appellant's full and total complicity so belied the statement he gave to the investigators, indicating minimal involvement and little knowledge, that they concluded that he had not, pursuant to the agreement, given "a statement of truth of all knowledge of the crime." As a result, the decision was made to press forward with all charges against him. The appellant moved to have the charges dismissed pursuant to the agreement. Judge Bowling denied this motion and the present appeal has followed from that denial.

### *Only the State's Attorney, Not the Police, May Bind the State*

Even before considering whether we are dealing with (1) a grant of immunity, (2) a plea bargain, or (3) some other

miscellaneous bargain, we should address preliminarily the question of who bargained or promised anything on behalf of the State and whether that party had any authority so to bargain or to make a promise that had any binding effect. The appellant's negotiations were with two policemen. If the representation of the State had ended at that point, it is clear that there would be no justiciable issue before us. As Judge Wilner thoroughly analyzed for this Court in *Winkles v. State,* 40 Md.App. 616, 620-621, 392 A.2d 1173 (1978), the police, in their own right, have no authority to commit the State to anything by way of declining to prosecute:

> "That promise [not to prosecute] could *only* be made by the State's Attorney. The discretion as to whether to prosecute is *solely* in the State's Attorney, and only that official (or his authorized assistants, in his name) could validly exercise that discretion in the manner necessary to make valid the alleged agreement. Certainly, a police officer has neither the power himself to make such a promise, nor to bind the State's Attorney to it." (Emphasis in original).

The *Winkles* decision not only stated the law unequivocally but analyzed why the law in that regard must and should be as it is, explaining at 40 Md.App. 621:

> "To conclude otherwise would not only risk the serious possibility of corruption, abuse, and substantial mischief and uncertainty in the prosecution of criminal cases, but would infringe upon the discretion constitutionally committed to the State's Attorney. *See Brack v. Wells,* 184 Md. 86 (1944); *Murphy v. Yates,* 276 Md. 475 (1975)."

In the present case, however, Investigator Coffey had conferred, by telephone, with the State's Attorney for Charles County, Stephen Braun, and received Mr. Braun's permission to negotiate on behalf of the State. Although Mr. Braun was subsequently appalled at the vague and inartful phrasing of the agreement, his assistant stipulated in open

court that the State's Attorney's Office considered itself honor bound as well as legally bound to abide by the terms of the agreement. Accordingly, our analysis must move forward to the nature of that agreement.

### The Plurality of Benefits That May Be Conferred, with or without Bargaining

Even when the State's Attorney, directly or indirectly, is acting as an authorized representative of the State, at least three significantly distinct legal phenomena may be involved in his actions. We should meticulously keep separate and apart the subjects of (1) the conferral of immunity, (2) a plea bargain, and (3) some other bargain involving something other than a plea to a criminal charge. The sources of authority are different. The social purposes are different. The legal incidents are different. The procedural rules are different. Other than the very general notion of some *"quid pro quo,"* the three phenomena are distinct. We only do the law a disservice when we heedlessly blur those distinctions.

The conferral of immunity, which involves no bargaining, is further removed conceptually from the two types of bargains than they are from each other. To compare immunity to bargaining is truly to compare apples with oranges, whereas to compare the one type of bargaining with the other is perhaps only to compare oranges with tangerines. Even there, however, there is a difference.

### The Granting of Immunity ·

Immunity with a capital "I" is legislatively authorized, legally cognizable, and judicially enforceable. "There is no inherent, common law power in the State's Attorney or in the Grand Jury or in the judge or in anyone else to confer immunity from prosecution. Immunity is exclusively a creation of statute and can only exist when a statute has brought it into being. Maryland has no general immunity statute." *Bowie v. State,* 14 Md.App. 567, 575, 287 A.2d 782 (1972), quoted with approval in *In Re Special Investigation No. 231,* 295 Md. 366, 371, 455 A.2d 442, 444 (1983).

.

Maryland has a few limited provisions, both constitutional and statutory, for the granting of immunity for certain specific crimes. *See, for example,* Md. Const., art. IV, §4B (Compelled Testimony Before Judicial Disabilities Commission); Article 27, Section 23 (Bribery of Public Officers); Article 27, Section 24 (Bribery in Athletic Contests); Article 27, Section 39 (Conspiracy to Bribe); Article 27, Section 262 (Gambling); Article 27, Section 371 (Lottery); Article 27, Section 400 (Obtaining Liquor by Minors); Article 27, Section 540 (Sabotage); Article 33, Section 26-16(c) (Fair Election Practices). Maryland has also provided a "use immunity" for one compelled to testify in a supplementary proceeding. Md. Cts. & Jud. Proc. Code Ann. §9-119 and Maryland Rule 628c.

Neither armed nor unarmed robbery is among these. Nor is assault with intent to disable; nor is false imprisonment; nor is the use of a handgun in the commission of a felony. Under the circumstances, the State's Attorney could not have conferred immunity upon the appellant here, even if he had wanted to and even if he had tried to. Immunity, as a formal concept, simply does not exist outside of an explicit authorizing statute. As Judge Smith recently pointed out for the Court of Appeals in *In Re Special Investigation No. 231, supra,* at 295 Md. 371, quoting from *Bowie v. State, supra,* at 14 Md.App. 575:

> "It is universally recognized that, absent a statutory grant of power, the prosecuting attorney is not entitled, solely by virtue of his office, to confer immunity upon a witness."

The reason why this vital social decision, and therefore the allocated power, to forego a criminal prosecution is vested in the legislative branch of government, and not the judicial or executive branches, was forcefully articulated by Chief Justice Cardozo for the New York Court of Appeals in *Doyle v. Hofstader,* 257 N.Y. 244, 177 N.E. 489, 495 (1931), quoted with approval in both *In Re Special Investigation No. 231, supra,* and *Bowie v. State, supra:*

> "The conclusion, we think, is inescapable that the

power to suspend the criminal law by the tender of immunity is not an implied or inherent incident of a power to investigate. It may be necessary for fruitful results in a particular instance, but it is not so generally indispensable as to attach itself automatically to the mere power to inquire. Whether the good to be attained by procuring the testimony of criminals is greater or less than the evil to be wrought by exempting them forever from prosecution for their crimes is *a question of high policy as to which the law-making department of the government is entitled to be heard."* (Emphasis supplied).

Our "law-making department of the government" simply has not sanctioned the granting of immunity (in any of its forms) in exchange for testimony (let alone mere information) as to robbery.

Immunity comes, of course, in three forms. "Use immunity" simply means that the compelled testimony will not be used directly against the compelled witness. It has long been recognized that "use immunity" alone is not broad enough to defeat the privilege, for the danger remains that the compelled testimony might be used indirectly or derivatively to place the witness in a more incriminated posture than he had been in before his testimony. *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). "Transactional immunity" is the broadest of the three forms and means that the compelled witness will not be prosecuted at all for the criminal transaction about which he is compelled to testify. In the wake of *Counselman v. Hitchcock, supra,* and for the next sixty years, it was broadly perceived that transactional immunity was the only alternative to use immunity and was, therefore, the only kind of immunity that would effectively negate the privilege against compelled testimonial self-incrimination. This is why most immunity statutes, including Maryland's, confer a broader immunity (transactional) than is now constitutionally required. The intermediate and constitutionally sufficient variety of "use plus derivative use immunity" was effec-

tively developed in 1964 in *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), and received the Supreme Court's official seal of approval in 1972 in *Kastigar v. United States,* 406 U.S. 441, 446, 92 S.Ct. 1653, 32 L.Ed.2d 212, 218 (1972). "Use plus derivative use immunity" guarantees the compelled witness not simply that his words will not be used against him directly, but also that they will not be used indirectly as leads to the development of derivative evidence. This "leaves the witness and the . . . Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity." *Murphy v. Waterfront Commission, supra,* at 378 U.S. 79.[1]

Formal immunity is dramatically distinguished from informal agreements that "partake of," "sound in," or somehow resemble formal immunity. Formal immunity is not necessarily the subject of a bargain and is frequently forced upon a reluctant witness against that witness's will. A witness is summonsed to testify at a trial or before a grand jury. The witness claims the privilege against compelled testimonial self-incrimination. The State, upon explicit statutory authorization, may then officially and upon the record confer a grant of the appropriate form of immunity upon the recalcitrant witness, whether that witness wishes it or not. The witness is then compelled to testify under threat of contempt, for there is no longer any danger that the compelled testimony could operate to incriminate.

---

1. Kastigar v. United States, *supra,* summarized at 406 U.S. 453:

"We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against compelled self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege."

For a constitutionally mandated and self-executing "use immunity," *see* Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

Formal immunity, moreover, is never given in exchange for (1) cooperation, (2) information, or (3) even non-privileged testimony. The very notion of immunity has no existence outside the context of the constitutional privilege against compelled testimonial self-incrimination. It is the "flipside" of the privilege. "Immunity displaces the [privilege]." *Ullmann v. United States,* 350 U.S. 422, 439, 76 S.Ct. 497, 100 L.Ed. 511, 525 (1956). "Removing liability removes the danger against which the privilege protects and makes the privilege unavailable." McCormick, *Evidence* (2d ed. 1972), §143, "Removing the Danger of Incrimination: Immunity and Immunity Statutes," at 304. "It [a grant of immunity] thus takes away his constitutional privilege against self-incrimination when he is compelled so to testify and grants him an immunity from prosecution, trial and punishment in place of the privilege." *State v. Panagoulis,* 3 Md.App. 330, 337, 239 A.2d 145 (1968), *aff'd,* 253 Md. 699, 253 A.2d 877 (1969). "[Immunity statutes] seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify." *Kastigar v. United States, supra,* at 406 U.S. 446. Consequently, we should not even use the term of art "immunity" except when we refer to an official grant of immunity in court, pursuant to an authorizing statute, for the single purpose of compelling testimony that would, but for the immunity, be self-incriminating and therefore privileged. Although a *quid pro quo* of forbearing to prosecute in exchange for anything other than privileged testimony may resemble transactional immunity, it is not immunity.

Unlike an informal (even if judicially enforceable) agreement not to prosecute given in exchange for cooperation, information, or testimony, a formal grant of immunity is never conditional. Confronted with an assertion of the privilege, the prosecutor "throws the dice" and confers unconditional immunity. From that point on, his only guarantees of adequate testimonial performance are the threat of contempt and the threat of perjury.

Although a prosecutor's promise not to prosecute (having certain attributes of transactional immunity) might, under

some emerging theory of equitable estoppel, be judicially enforceable against that prosecutor and those in privity with him in chain of command or line of succession, the legal effect would stop there. That extralegal, even if equitably enforceable, promise would not bind other prosecutors' offices even in the same state, let alone other states or the federal government. A legislatively sanctioned grant of official immunity, on the other hand, would have far-flung legal impact. The conferral of immunity would, according to its terms, bind all other prosecutors in the same state. It would, moreover, under the due process clause, confer "use and derivative use" immunity against all other states and against the federal government.[2] *Murphy v. Waterfront Commission, supra.*

Although the appellant repeatedly invoked and alluded to an entitlement to "immunity," it is clear in the case now before us that we are not remotely dealing with formal immunity in any of its forms. As we move to other issues, therefore, we should, except to contrast it, scrupulously avoid any mention of the very word "immunity."

### A Plea Bargain

"Plea bargain" is also a term of art that should be used with care and precision. In *Gray v. State,* 38 Md.App. 343, 356, 380 A.2d 1071 (1977), this Court, speaking through Judge Wilner, defined this term of art:

> "Traditionally, a 'plea bargain' or 'plea agreement' contemplates a conditional plea of guilty or nolo contendere to one or more pending charges, the condition usually being either the dismissal or lessening of other charges by one means or another, or some concession being made with respect to disposition, or both."

---

2. A grant of transactional immunity by one jurisdiction may never bind another jurisdiction, for one sovereignty may not infringe upon the prerogative of another. Due process does not require such a broad grant of transactional immunity in order to defeat the privilege and compel testimony. Kastigar v. United States, *supra.*

In that decision, Judge Wilner went on to analyze why a plea bargain and the obligation of the State to live up to its bargained performance fall clearly under the supervisory power of the court. It is because "[a] traditional type of plea bargain, founded upon a plea of guilty or nolo contendere, necessarily invokes the exercise (or non-exercise) of judicial discretion." 38 Md.App. at 356. The Court pointed out that, where "the court's discretion is directly or tacitly required in order to implement the agreement, the court has a right, in determining whether and how to exercise its discretion, to inquire into the agreement and satisfy itself that it is appropriate." *Id.* at 357. That same decision went on to point out, by way of contrast, that where what is involved is not a plea bargain and where the reciprocal promises are to do things within the unfettered discretion of the defendant and the State, respectively, with no approval by the court being required, the court lacks the same broad power to intervene and to supervise that is present in the case of the plea bargain.

The clear jurisdictional predicate for the court's power to enforce the terms of a plea bargain is set forth by both the Supreme Court and our Court of Appeals. The court must satisfy itself that a plea of guilty on the part of the defendant is freely and voluntarily entered into. A breach by the State of its part of the bargain negates the voluntariness of the plea and justifies its withdrawal. In *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427, 433 (1971), the Supreme Court referred to this judicial supervisory power over the acceptance of a guilty plea:

"A court may reject a plea in exercise of sound judicial discretion.

This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the

prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."

In *Miller v. State,* 272 Md. 249, 255, 322 A.2d 527 (1974), the Court of Appeals, speaking through Judge Eldridge, also pointed out the vital connection between the prosecutor's performance of his part of the bargain and the voluntariness of the guilty plea, the unfairness of holding the defendant to his agreement following a breach by the prosecutor:

"The reason the defendant is usually permitted to withdraw his guilty plea, if that is his choice, was expressed by Mr. Justice Marshall in *Santobello* as follows ([404 U.S.] at 268):

'When a prosecutor breaks the bargain, he undercuts the basis for the waiver of constitutinal rights implicit in the plea. This, it seems to me, provides the defendant ample justification for rescinding the plea. Where a promise is "unfulfilled," *Brady v. United States,* 397 U.S. 742, 755 (1970), specifically denies that the plea "must stand." '

In our view, the better practice, and the one supported by the majority of cases, is to permit the defendant to withdraw the plea. Accordingly, where a guilty plea has been induced by the prosecutor's agreement to make no recommendation as to sentencing, and the prosecutor violates that agreement, the defendant may at his option have the guilty plea vacated."

The predicate for the court's intervention is by no means so clear when the bargain between a suspect and a prosecutor involves something other than a plea, which must be accepted by the judge and the voluntariness of which must be established before him. In yet another significant regard, the plea bargain contrasts with other miscellaneous bargains. The interest of the courts in the plea bargaining pro-

cess is based not so much on the equitable notion that every suspect citizen be treated fairly by the elected prosecutor but rather on the credibility of the plea bargaining process and the indispensable role that that process today plays in the management of an otherwise overwhelming caseload. The vital nature of the plea bargaining process was well summarized by the Supreme Court in *Santobello v. New York, supra,* at 404 U.S. 260-261:

> "The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called 'plea bargaining,' is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities.
>
> Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons."

This indispensable role played by the plea bargaining phenomenon in the administration of the criminal justice system and the consequent concern of the courts for maintaining the credibility of this plea bargaining process, were well expressed for our Court of Appeals by Judge Digges in *State v. Brockman,* 277 Md. 687, 692-693, 357 A.2d 376 (1976):

> "We begin our analysis of the law by considering the role plea bargains now play in the administration of both this State's and the nation's criminal justice systems. The simple fact is that today plea agreements account for the disposition of an overwhelming percentage of all criminal cases. . . . If this were not so, but rather every case entailed a full-scale trial, state and federal courts would be flooded, and court facilities as well as personnel would have to be multiplied many times over to handle the increased burden."

On the only occasion when the Supreme Court has ventured to oversee the performance by the prosecutor of his part of a bargain, it has been within the clear context of the formal offering and accepting of a plea of guilty. *Santobello v. New York, supra.* On virtually every occasion when the appellate courts of this State have ventured to oversee the performance by the prosecutor of his part of a bargain, it has been within the clear context of the formal offering and accepting of a plea of guilty. *Miller v. State, supra; State v. Brockman, supra; Brockman v. State,* 27 Md. App. 682, 341 A.2d 849 (1975); *Sturgis v. State,* 25 Md. App. 628, 336 A.2d 803 (1975); *Wynn v. State,* 22 Md.App. 165, 322 A.2d 564 (1974). This was the clear context in which the Court of Appeals reached its holding in *State v. Brockman, supra,* that "plea agreements are at times entitled to judicial enforcement." In explaining that holding, Judge Digges pointed out that the voluntariness of the guilty plea, which is the heart of the matter squarely before the judge, is contingent upon the promise of the prosecutor and the expectation that that promise will be fulfilled, at 277 Md. 694:

> "It is, of course, no longer open to question that plea agreements are at times entitled to judicial enforcement. In *Santobello v. New York, supra,* 404 U.S. at 262, 92 S. Ct. at 499, Chief Justice Burger, for the Supreme Court, said quite plainly that
>
>> 'when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.'"

In the case before us, there is no plea of guilty to be reviewed. The appellant entered a plea of not guilty as to all charges, went to trial, and was found guilty on all charges. Since there was no plea of guilty or *nolo contendere* on the part of the appellant, let alone a plea of guilty or *nolo contendere* conditioned upon the dismissal or lessening of other charges by the prosecutor or concession by the prosecu-

tor with respect to disposition, the bargain in this case, whatever it was, was not a plea bargain. The clear supervisory power of the court and the broad social justification militating toward that supervisory power are, therefore, not involved.

If this case is not a case involving immunity and is not a case involving a plea bargain, what then is it?

### Other Miscellaneous Bargains

On the cutting edge of the law, there is yet a third and only recently recognized area of emerging judicial concern — certain other quasi-contracts between suspect and prosecutor, the terms of which call for official action in the courtroom or on the face of the docket and which require the approval of the court. *Contrast Gray v. State, supra,* at 38 Md.App. 357-359, for actions or omissions to act which are in the unfettered control of defendant or State, respectively, and do not require approval of, or trigger intervention by, the court.

Maryland is a pioneer in this developing area. In *State v. Thompson,* 48 Md.App. 219, 426 A.2d 14 (1981), we recognized the existence of, as well as the limitations upon, this form of extraordinary relief.[3] At issue was an effort by the State to remove a case from the stet docket which had lain dormant for eight months pursuant to an agreement between State's Attorney and defendant that it would never be taken from the stet docket. In that case, there was no question that the defendant had fully performed everything he had agreed to do in exchange for the entering of the stet. Invoking the equitable considerations alluded to in *Bowie v. State, supra,* and *In Re Special Investigation No. 231, supra,* Chief Judge Gilbert pointed out that the issue was whether "removal of the case from the stet docket would be unfair and inequitable." 48 Md.App. at 220.

---

**3.** *And see generally, Judicial Supervision of Non-Statutory Immunity,* 65 J.Crim.L. & Criminology 334 (1974).

The factual context of *Thompson* demonstrates the factors that properly circumscribe the exercise of the broad relief there granted by Judge Pines in the Criminal Court of Baltimore. In affirming Judge Pines, we found there to have been both a jurisdictional predicate for his action and compelling circumstances to justify the action. The State had initially placed a case on the stet docket, pursuant to a "bargain" with an indicted defendant. There was no remote suggestion that the defendant breached his part of the bargain. The effort by the State to remove the case from the stet docket some eight months later was found by Judge Pines, and deemed by us, to be an act of gratuitous vindictiveness.

The participation of the trial court in the operation of the stet docket is clear. As Judge Orth pointed out in *Brown v. State,* 2 Md.App. 388, 396, 234 A.2d 788 (1967), the entry of a stet was once within the unfettered discretion of the prosecuting attorney. Hochheimer, *Law of Crimes and Criminal Procedure* (1st ed. 1897) §210, at 139. In 1965, however, the new Maryland Rule of Procedure 718 provided that a case could be placed upon the stet docket only by the order of the court. The currently applicable Maryland Rule 782c provides that, "Upon motion of the State's Attorney, *the court may* indefinitely postpone trial upon a charging document by marking the case 'stet' on the docket." (Emphasis supplied). The rule provides further that a case "may not be stetted over the objection of the defendant."

The removal of a case from the stet docket and the rescheduling of it for trial are also actions to be taken by the court, for the rule provides that the court "may" agree to such a procedure "at the request of either party within one year and thereafter only by order of court for good cause shown." We thoroughly analyzed the stet procedure in *State v. Jones,* 18 Md.App. 11, 32-37, 305 A.2d 177 (1973), wherein we pointed out that "[t]he stet, in Maryland, is simply an indication by the prosecutor, *acquiesced in by the court,* that he does not choose at that time on that indictment to proceed further with the prosecution." 18 Md.App. at 34 (emphasis supplied). The supervisory control of the trial judge over the stet docket was not to be doubted.

Not only did the trial court have a clearly established jurisdictional predicate for the relief it granted, but there were also in the *Thompson* case compelling circumstances that justified the relief given. As we observed, at 48 Md.App. 222:

"The crystalline inference that permeates the record in this case is that the Assistant State's Attorney was piqued because of the jury's verdict, and he seized upon the stet as a way of balancing the scales. In fact, he told Judge Pines that if the jury had convicted the appellee, the instant case would have been closed."

In holding literally that Judge Pines did not abuse his discretion, we concluded, "The awesome power, vested by the people in the State's Attorney, should not be employed for the purpose of applying balm to a wounded ego or to the fulfillment of a personal vendetta." *Id.* at 222-223. In the extraordinary circumstances of that case, the granting of extraordinary relief was not an abuse of discretion.

Neither *State v. Thompson* nor any other case in Maryland history has ever suggested that the court is, in the broad sense, the keeper of the State's Attorney's conscience; and, of course, it could not be. The State's Attorney is no court house employee but the holder of an independent, elective, constitutional office, accountable essentially to his electorate for the conduct of his office. *Brack v. Wells,* 184 Md. 86, 40 A.2d 319 (1944); *Murphy v. Yates,* 276 Md. 475, 348 A.2d 837 (1975). The doctrine of separation of powers would brook no roving commission by the judicial branch to monitor the conduct or the judgment of an elective official of the executive branch. To contemplate in the most fragmentary of ways the open-ended list of bargains a State's Attorney might strike with a citizen, including a criminal suspect, is to appreciate the impossibility, as well as the unconstitutionality, of judicial interference in the process.

On the one hand, when the State's Attorney grants legislatively authorized immunity, that official act has its own

legal significance (as does, for instance, the entry of a *nolle prosequi)* and the court simply interprets that act (it may neither approve nor disapprove the grant itself, for the legislature has vested that power exclusively in the executive branch). When the fulfillment of the State's Attorney's promise is a condition of the voluntariness of a guilty plea which must be accepted by the court, the predicate for the court's involvement in the process is clear. So too, the placing of a case upon or the taking of a case from the stet docket implicates the court in the process.

When, on the other hand, the "bargain" is further afield, it clearly is not, and should not be, the business of the criminal court. If the State promises a witness police protection and fails to deliver, if the State promises (as sometimes does the FBI) to provide a witness with a new identity and fails so to provide, this may be a matter for a court of law or equity for breach of contract but it is not a matter for the criminal court. There may be the sanction of specific performance or of money damages but not of the dismissal of an otherwise valid indictment against the aggrieved party. In return for cooperation, information, or a wide variety of services, the State's Attorney may have promised a criminal suspect anything — anonymity, $25 per tip, a trip to Florida, a free bed for the night, a letter of recommendation for a job, a new set of false teeth. If then, for one reason or another, the State's Attorney plays false, this does not *ipso facto* confer jurisdiction on the criminal court to punish the State's Attorney for his perfidy by dismissing indictments. The forum for redress may be the attorney grievance committee or the editorial page or the legislative impeachment process or the next election, but the criminal court does not have a sweeping mandate to right all the ills of the world and certainly not those in an equal and coordinate branch of government.

In sorting out those bargains between prosecutor and suspect that are indisputably beyond the pale of judicial intervention from those other bargains that might arguably fall within the jurisdiction of the criminal court, the infalli-

ble criterion is the involvement of the due process clause. Where the thing the suspect arguably bargained for and was arguably denied does not relate to a criminal charge against him, there can be, by definition, no claim that he has been denied life, liberty or property without due process of law. A necessary, although not always a sufficient, condition for judicial intervention is the presence of criminal charges against the bargaining suspect. The ensuing question then becomes one of whether that suspect was somehow denied life, liberty or property by virtue of his reliance upon the false promise of the State's Attorney. Jurisdiction to intervene is rooted in the due process clause.

Where a criminal charge and, therefore, the due process clause are not involved, the inquiry is at an end. Where there is pending before the judge a criminal charge, however, and where the due process guarantee is arguably involved, the inquiry must go further. The case before us did, of course, involve a pending criminal charge.

Although the predicate for judicial intervention here is far less clear than in *State v. Thompson, supra,* we will accept for purposes of this case the Attorney General's concession that the State's promise not to bring charges under the terms of the agreement was subject to review by the court.[4] It is clear here that the court did not give the appellant the benefit of any such review but rather considered itself without competence to act, under the apparent authority of *Bowie v. State, supra.* Accepting as we do for purposes of this case the Attorney General's concession, we hold that the court should have reviewed the terms of the bargain and the respective performances according to those terms and that the failure to do so may have deprived the appellant of a successful plea in bar to his trial for robbery.

---

4. This is an unsettled area of law wherein courts are well advised to tread warily. Although it was not essential to the holding in that case, the Court of Appeals in In Re Special Investigation No. 231, *supra,* at 295 Md. 373, did quote with approval the following passage from 21 Am.Jur.2d, *Criminal Law* §211 (1981):

"[E]ven in the absence of specific statutory authority, there is an established practice in American courts not to prosecute an accom-

## The Limited Remand

The first question that arises from that holding is that of the appropriate scope of the remand. It is the clear distillation of *Gill v. State,* 265 Md. 350, 289 A.2d 575 (1972), and *Wiener v. State,* 290 Md. 425, 437-439, 430 A.2d 588 (1981), that if "the purposes of justice will be advanced by permitting further proceedings in the cause," a limited remand is both permitted and appropriate. Maryland Rule 1071a.[5] *Wiener v. State, supra,* states unequivocally that Maryland Rule 871a (dealing with the Court of Appeals) and Maryland Rule 1071a (dealing with this Court) are "companion" rules. 290 Md. at 437. The two cases distinguished between the limited remand that "may be suitable to correct procedures subsidiary to the criminal trial" and the limited remand that "can never be utilized to rectify prejudicial

plice who has testified for the government in the expectation of immunity from prosecution, and such a witness is said to have an equitable claim to immunity from prosecution. Where the case is not within any statute, the general rule is that if an accomplice, when examined as a witness by the public prosecutor, discloses fully and fairly the guilt of himself and his associates, he will not be prosecuted for the offense disclosed, but he cannot plead such fact in bar of any indictment against him or avail himself of it on his trial, since it is merely an equitable right to the mercy of the executive and can only come before the court by way of application to put off the trial in order to give the prisoner time to apply to the executive for that purpose."

*See also* Bowie v. State, *supra,* at 14 Md.App. 576-578; Frady v. People, 96 Colo. 43, 40 P.2d 606 (1934); State v. Myers, 330 Mo. 84, 49 S.W.2d 36 (1932). This fundamental approach was first enunciated by the Supreme Court in United States v. Ford, 99 U.S. 594, 25 L.Ed. 399 (1878).

5. Maryland Rule 1071a in pertinent part provides:

"If it shall appear to this Court that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment from which the appeal was taken, or that the purposes of justice will be advanced by permitting further proceedings in the cause, either through amendment of the pleadings, introduction of additional evidence, or otherwise, then this Court, instead of entering a final order affirming, reversing or modifying the judgment from which the appeal was taken, may order the case to be remanded to the lower court. Upon remand to the lower court, such further proceedings shall be had by amendment of the pleadings, introduction of additional evidence, making of additional parties, or otherwise, as may be necessary for determining the action upon its merits as if no appeal had been taken and the judgment from which the appeal was taken had not been entered."

errors committed during the trial itself." *Gill v. State, supra,* at 265 Md. 357; *Wiener v. State, supra,* at 290 Md. 437-438. In *Gill v. State,* the error concerned the trial court's ruling on the voluntariness of a confession. Since it occurred in the course of the trial itself and since it impacted not only on evidentiary admissibility but also on evidentiary weight, a limited remand was held to be improper and a full new trial was called for. In *Wiener,* as in the case before us, the failure to make an adequate ruling was with respect to a defendant's right "collateral to the criminal trial itself." 290 Md. at 438. Under such circumstances, the limited remand described by *Wiener,* at 290 Md. 438, is equally appropriate here:

> "Unlike the issue relating to the voluntariness of the confession in *Gill,* evidence given in support of, or in opposition to, [appellant's] motion to dismiss is not presented again in the course of the trial for consideration with all of the evidence bearing on guilt or innocence. [Appellant's] non-jury case presents the type of an issue which meets the criteria suggested in *Gill* for a limited remand in a criminal case and we hold that Rule [1071a] may be applied."

We hold here under Rule 1071a, as the Court of Appeals held in *Wiener* under companion Rule 871a, that "the matter will be remanded for the limited purpose of conducting a new hearing on the issue of the claimed violation.... At this hearing additional evidence may be presented by [the appellant] and by the State.... The trial court should thereafter make specific findings of fact in support of its ruling." 290 Md. at 438.

Upon the limited remand, a number of elements should be analyzed.

## Who Were the Contracting Parties?

In all such cases, a reviewing judge must initially identify the parties to the bargain or contract in question and then decide whether those parties had the competence so to contract. In this case, that poses no problem. The competence of the appellant to obligate himself to furnish truthful information about a crime cannot be doubted. He is not subject, of course, to the full rigors of formal contract law. There is no reciprocity making him vulnerable to specific performance. There is, of course, the ever-present reality that his failure to abide by the terms of the agreement thereby relieves the State of any obligation to perform its part of the bargain. In this case, as well, the competence of the State's Attorney to authorize in advance or to ratify the bargain struck by the police as his agent is not contested.

## What Were the Terms of the Agreement?

The court, upon remand, should make a finding as to precisely what the State obligated itself to do. Although the four corners of the agreement committed only the two policemen not to charge the appellant, parol evidence seems clearly to have included the State's Attorney as an obligor. Does the agreement not to charge the appellant "for the crime of armed robbery" contemplate that he will not be charged for lesser included offenses or for other non-included offenses arising out of the same criminal incident? Although in this case that may well be found to have been the intention of the parties, future bargainers on behalf of the State might be well advised to draft such agreements with greater precision.

The court should, upon remand, also make a finding as to precisely what the appellant obligated himself to do. What exactly is "a statement of truth of all knowledge of the crime?" Was the obligation of the appellant to tell not simply the truth, but the whole truth?

### *What Shall Be the Burden of Proof with Respect to All of These Elements?*

Provided only that there be a meeting of the minds, the parties could allocate the burdens of proof (production and persuasion) to either the suspect or the State or they could apportion between them allocations as to different elements. They could, of course, establish the burden of persuasion at whatever level they agree upon.

In the absence of any agreement in this regard, however, the general rule would clearly prevail that the proponent of a proposition bears the burdens both of production and of persuasion. As Judge Rodowsky clearly pointed out for the Court of Appeals in *Wiener v. State, supra,* at 290 Md. 434:

> "It is also clear that the ultimate risk of non-persuasion . . . is on the accused, as the moving party on the motion to dismiss."

We spoke to the very same proposition in *Bowie v. State, supra,* at 14 Md.App. 573:

> "As the moving party, the appellant bore the burden of establishing a clear factual predicate for his theory of defense. Even leaving aside the question of whether the purported agreement was cognizable and enforceable at law, it was required of him to show 1) precisely what the agreement was, 2) his own performance in fulfillment of the agreed upon obligation and 3) an unjustified breaching of the agreement on the part of the State."

### *Who Should Judge the Adequacy of the Performance?*

Once again, the draftsmen of such agreements should not leave to chance or guesswork the selection of an appropriate arbiter. Although strict contract law does not apply, there are contract-like aspects to this business. The bottom line is that, provided only that it not be unlawful, two parties (including prosecutors and criminals) may agree to do

anything they wish in this regard. The only question is that of whether there was a meeting of the minds as to the choice of arbiter. If the State were so foolish, it has the unquestioned right to leave the adequacy of the suspect's performance to the unilateral judgment of the suspect himself. At the other extreme, the State could well insist that the adequacy of the suspect's performance would be judged by the State and by no one else. Intermediately upon that spectrum, the two parties could agree to submit the adequacy of the suspect's performance to a panel chosen by the Maryland State's Attorney's Association; to a panel chosen by the Public Defender's Office; to a criminal court judge; or, if it pleased them to do so, to Mrs. Oliver Rodriguez of 124 River Road, in Stockton, California; or to the General Counsel for the B. & O. Railroad. The point is that they could agree to anything. A little more advance care with respect to such agreements could remove much of this ambiguity.

It is not for the court to inject itself into the legislative or executive process and decide for itself what agreements may be entered into and what the terms of those agreements may be. The only question that will be asked under the aegis of the due process clause is whether a defendant relied to his detriment upon a false promise made by the State's Attorney and thereby suffered a deprivation of due process.

In the absence of any agreement in this regard, the responsibility to arbitrate would fall, by default, upon the judge in the criminal court, again assuming due process implications in the agreement.

### Did the Appellant Breach the Agreement by Inadequate Performance?

The question of whether the appellant here breached the agreement by an inadequate performance is the key factual finding that should be made upon the limited remand. If the appellant failed to live up to his promise, the State is, of course, relieved of its reciprocal obligation to forbear to bring charges. In that case, the convictions stand undisturbed. In

that case, there is no issue as to what the appropriate sanction should be.

If, on the other hand, the court should find that the appellant here had fully and adequately performed pursuant to the agreement, then and only then would it need to address the question of what is the appropriate sanction to bring to bear upon the defaulting State's Attorney.

## What is the Possible Sanction on the Prosecutor?

If, in dealing with an open-ended list of more informal agreements, it should be determined that a suspect has performed according to the agreement and the prosecutor has been guilty of a breach of contract, what should be the sanction? Should a judge, assuming he has any power to act at all, give the suspect the benefit of "use plus derivative use" immunity? This would take the suspect "back to square one" and insure that he suffer no detriment by virtue of his reliance on the false promise.

Should the judge go further, again assuming he has such power, and order specific performance on the part of the prosecutor? Under such circumstances, the prosecutor might comply with the judge's order or he might choose to defy it, thereby using his appeal from his inevitable contempt citation as the vehicle to test the propriety of that order.

May the judge not simply order the State, for instance, to drop charges but go even further and step in and drop the charges himself, as by directly dismissing an indictment?

These are by no means easy questions, and this newly developing area of the law needs some probing analysis. The questions should not be glossed over by the easy assumption that the judge may simply do anything he pleases.

In attempting to fashion an appropriate remedy, it is helpful constantly to refer back to the lodestar of the due process clause, which invigorates the very involvement of the court in the first instance. Is the question that of whether a defendant should receive everything which he may have earned according to the terms of the bargain? There seem to

be involved here questions of equity and of equitable estoppel. Or is the question that of whether the defendant is entitled, in the forum of the criminal court at least, only to so much by way of remedy as will guarantee that he not be unduly deprived of life, liberty or property?

A preliminary sub-issue is whether the defendant has actually given up anything at all that he was entitled to withhold. Testimony for the State, of course, is an obligation of citizenship and does not have to be bargained for or bought, except in those cases where it is privileged. *Kastigar v. United States, supra.*

If, however, the defendant has relied upon the State's false promise and delivered something that he was not obliged to deliver, how much by way of relief is required to ensure that that reliance shall not have worked to his detriment? "Use plus derivative use" immunity, though perhaps falling short of a defendant's full and even fair expectations, would appear sufficient to satisfy the more limited demands of due process of law. The defendant is back where he would have been if there had been no bargain. The State, in turn, has obtained no unfair advantage over the defendant.[6]

### Conclusion

Beyond the confines of this particular case, a little reflection on some of the considerations listed above should caution courts against too hasty an intervention in matters where their authority is perilously tenuous. It is not the job of the judicial branch to legislate a model code (let alone a mandatory code) of bargaining between prosecutor and suspect. The subjects on which those parties may bargain is infinite. The conditions that those parties may agree upon is infinite. The reach of the court, however, is finite, and an

---

6. The appellant in the present case received, in effect, "use plus derivative use" immunity whether he deserved it or not. The State did not "use" his statement against him at the armed robbery trial. The statement was, moreover, so palpably worthless as to have been incapable of producing any meaningful leads.

indispensable judicial attribute is an awareness of the limits of judicial power.[7]

> *Case remanded for further pro-ceedings in accordance with this opinion; costs to be paid by Charles County.*

---

**7.** We are speaking of judges generally. The trial judge in the present case was a model of judicial restraint.