MAYO, Appellant,

v.

KENWOOD COUNTRY CLUB, INC., Appellee.

[Cite as *Mayo v. Kenwood Country Club, Inc.* (1999), 134 Ohio App.3d 336.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–980528.

Decided April 23, 1999.

338

*Schwartz, Manes & Ruby, Donald B. Hordes* and *H. Toby Schisler,* for appellant.

*Buechner, Haffer, O'Connell, Meyers & Healey Co., L.P.A., Edward M. O'Connell, Jr.,* and *Laurie M. Harmon,* for appellee.

PAINTER, Judge.

Appellant Ruben Mayo, a maitre d' formerly employed by appellee Kenwood Country Club, Inc. ("Kenwood"), raises three assignments of error in this appeal, all challenging the summary judgment granted by the trial court in favor of Kenwood on his claims of retaliatory constructive discharge, wrongful discharge in violation of public policy, and intentional infliction of emotional distress. The gravamen of Mayo's first two claims is that Kenwood constructively discharged him because he had provided deposition testimony favorable to three Kenwood

waitresses in their age-discrimination case against Kenwood. We address Mayo's first two assignments together.

## I. Standard of Review

This court's review of summary judgment is *de novo*.[1] To properly grant summary judgment, a court, upon reviewing the evidence in a light most favorable to the nonmoving party, must determine that (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party.[2] Where a moving party asserts that the nonmoving party cannot prove its case, the moving party must provide the basis for its assertion and identify Civ.R. 56(C) evidence that affirmatively demonstrates that the nonmoving party has no evidence to support its claims.[3] If the moving party succeeds in meeting this burden, the nonmoving party, as outlined in Civ.R. 56(E), must set forth specific facts showing that there is a genuine issue of material fact. A material fact is one that " 'might affect the outcome of the suit under the governing law.' "[4] A "genuine issue" exists when the evidence presents " 'a sufficient disagreement to require submission to a jury.' "[5]

## II. Retaliatory Discharge

To support his claim of retaliatory discharge, Mayo must prove that he engaged in a protected activity of which Kenwood had knowledge, that he suffered an adverse employment action, and that Kenwood's adverse action followed his participation in the protected activity and was causally related to the protected activity.[6] A review of Mayo's complaint indicates that the "adverse employment action" about which he complains is his alleged constructive discharge.

---

1. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 30 OBR 78, 506 N.E.2d 212; *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 641 N.E.2d 265.

2. See *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 639 N.E.2d 1189; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

3. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274.

4. *Turner v. Turner* (1993), 67 Ohio St.3d 337, 339, 617 N.E.2d 1123, 1125, quoting *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211–212.

5. *Id.*, quoting *Anderson v. Liberty Lobby, Inc., supra*, at 251–252, 106 S.Ct. at 2512, 91 L.Ed.2d at 213–214.

6. *Pulver v. Rookwood Highland Tower Investments* (Mar. 26, 1997), Hamilton App. No. C–950361, unreported, 1997 WL 133422.

## III. Wrongful Termination in Contravention of Public Policy

■ To demonstrate wrongful termination in contravention of public policy, Mayo, as an at-will employee, must demonstrate the following: (1) that a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law; (2) that dismissing him under the attendant circumstances would jeopardize that public policy; (3) that his dismissal was motivated by conduct related to that public policy; and (4) that Kenwood lacked an overriding legitimate business justification for the dismissal.[7] Once again, the dismissal about which Mayo complains is his alleged constructive discharge.

## IV. Mayo's Claims of Retaliation and Dismissal Rest on His Allegation of Constructive Discharge

■ We read Mayo's complaint as clearly resting on the issue of whether Kenwood *constructively* discharged him. While we recognize that the trial court went beyond the analysis necessary to determine this case and examined each element of each claim, we limit our discussion to whether Kenwood constructively discharged Mayo. Without a constructive discharge, Mayo's claims, as defined in his complaint, must fail.[8] A claim of constructive discharge is, in essence, a claim that an employer's conduct was such that the employee was "forced * * * to sever the employment relationship involuntarily."[9] When determining whether an employee has been constructively discharged, courts generally apply an objective test.[10] Thus, Mayo must demonstrate that his working conditions "were so intolerable that a reasonable person * * * would have felt compelled to resign."[11] "[P]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."[12] Further, an employee's perception that he was forced to resign must be judged "without consideration of his undue sensitivities."[13]

---

**7.** *Chapman v. Adia Serv., Inc.* (1997), 116 Ohio App.3d 534, 688 N.E.2d 604.

**8.** *Mauzy v. Kelly Serv., Inc.* (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272.

**9.** See *Powers v. Springfield City Schools* (June 26, 1998), Clark App. No. 98–CA–10, unreported, 1998 WL 336782.

**10.** *Mauzy v. Kelly Serv., Inc., supra,* at 588, 664 N.E.2d at 1280; *Chapman v. Adia Servs, Inc., supra.*

**11.** *Mauzy v. Kelly Serv., Inc., supra,* at paragraph four of the syllabus.

**12.** *Garner v. Wal–Mart Stores, Inc.* (C.A.11, 1987), 807 F.2d 1536, 1539.

**13.** *Wilson v. Firestone Tire & Rubber Co.* (C.A.6, 1991), 932 F.2d 510, 515.

In reviewing Mayo's claim, we must undertake a case-specific analysis that includes " 'an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct on the employee,' " to determine whether a reasonable person would have felt compelled to resign.[14] In other words, a constructive discharge occurs when "a reasonable person in [the employee's] shoes would feel compelled to resign given the intolerable conditions and that the reasonable employer would foresee such a response."[15] The subjective intent of the employer is not relevant.[16] (The employer usually denies a conscious design to force termination.) Instead, an employer is held to have intended the consequences it could have reasonably foreseen.[17] Further, to show constructive discharge, an employee must demonstrate that "the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent."[18]

Because Mayo is the nonmoving party, we consider the evidence most favorably toward him. This means that "[e]ven the inferences to be drawn from the underlying facts contained in the affidavits and depositions must be construed in [Mayo's] favor."[19]

## V. Facts

### A. Mayo's Retaliation Fear

On January 19, 1993, Mayo provided deposition testimony in an age-discrimination suit against Kenwood. He testified that James Rentschler, Kenwood's clubhouse manager and Mayo's direct supervisor, requested that he terminate the three plaintiffs in that case for a variety of reasons, including the belief that younger waiters and waitresses would boost sales.

The evidence demonstrates that once he decided to testify, Mayo feared retaliation by Kenwood for doing so. This fear continued immediately after his deposition, in spite of Kenwood's assurances that Mayo should tell the truth and

---

**14.** See *Chapman v. Adia Serv., Inc., supra,* at 545, 688 N.E.2d at 611, quoting *Scandinavian Health Spa, Inc. v. Ohio Civ. Rights Comm.* (1990), 64 Ohio App.3d 480, 487, 581 N.E.2d 1169, 1173.

**15.** *Scandinavian Health Spa, Inc. v. Ohio Civ. Rights Comm., supra,* at 487, 581 N.E.2d at 1174.

**16.** *Clark v. Marsh* (D.C.Cir.1981), 665 F.2d 1168, 1175, fn. 8.

**17.** *Id.*

**18.** *Mauzy v. Kelly Serv., Inc., supra,* at 589, 664 N.E.2d at 1281.

**19.** *Turner v. Turner, supra,* at 340, 617 N.E.2d at 1127.

that there would be no retaliation. At some point after the deposition, Mayo began keeping notes of what he perceived to be unfavorable treatment of him, and he tape-recorded at least two staff meetings. He also contacted the attorney who represented the plaintiffs in the age-discrimination suit a few months after the suit settled. Mayo claims that that contact was made in June 1993.

The attorney telephoned Kenwood's attorney in July or August 1993. A followup letter was sent expressing Mayo's concerns about his position. At the time the letter was written, Mayo stated that he was concerned because his authority was being undermined by Rentschler's reversal of his termination decisions; because his schedule was changed for the first time in seven years in that he had to work six days a week with longer hours, while other employees' schedules did not increase to the extent that his did; and because the responsibility for scheduling waiters, waitresses, and servers was taken away from him, allegedly because he did not honor employees' requests for days off. (Mayo testified that he informed Rentschler that that was untrue, but he did not ask for the scheduling responsibility to be returned.) The letter explained Mayo's concerns about retaliation and offered to settle in order to avoid litigation. Mayo was assured in a letter delivered by Kenwood's president of the board that retaliation would not occur and that Kenwood would investigate his concerns.

## B. Kenwood's Conduct

Beginning in 1992, Kenwood's food and beverage operations began experiencing fiscal problems. Rentschler, as the ultimate manager of the clubhouse, was under pressure and felt that he had to impress on his staff the need to improve service. Rentschler yelled at his staff and threatened that if he lost his job, others would "go down" with him. Others perceived Rentschler's comments as criticisms but did not take them personally. Rentschler criticized Mayo and his assistants for not turning off the coffee urns and for not keeping the dining and party rooms clean. Rentschler increased the work hours of people in supervisory positions and believed the maitre d' position was a six-day-a-week position. (Knowing the long hours required, Vicki Penwell, the assistant maitre d' under Mayo, upon being offered the position after Mayo resigned, refused because of the long hours.) Rentschler was viewed by some members of Kenwood and by some employees as a poor manager.

Specifically as to Mayo, the record demonstrates that Rentschler yelled at him on two or three occasions, criticized him personally in five or six out of sixty staff meetings, informed the staff that he was using Valium, took away scheduling duties after receiving complaints, and wrongly accused him of leaving early once and of giving away a birthday cake. Mayo also claims that he was excluded from two meetings. Further, Rentschler, who had the ultimate responsibility for

employment decisions, questioned Mayo about three of his termination decisions and two of his hiring decisions. Rentschler overruled one of Mayo's termination decisions based on the belief that the evidence would not be sufficient to uphold the decision in the union grievance process.

Rentschler also informed Mayo over a period of several years that he needed improvement in the areas of administration, organization, and staff training and communication. Rentschler testified that Mayo needed to expand his abilities to search out new tasks, to save the club money, and to improve service, and that Mayo's deficiencies in staff training and communication contributed to the losses of the food and beverage operations. Mayo also set as personal goals improvement in those areas.

The evidence also demonstrates that Phillip Wheeler, chairperson of the committee that oversaw the clubhouse operations, met with Mayo. Wheeler called the meeting because he had heard that Mayo was unhappy and he wanted Mayo's input as to the operation of the club. (Wheeler wanted to stop the food and beverages operations of the clubhouse from showing a loss.) Mayo complained about Rentschler's conduct toward him but did not mention his deposition testimony or his attorney's letter in the context of his complaints. Wheeler told Mayo he would look into his complaints and told Mayo to contact him about future problems. Mayo chose not to do so even though he claims that Rentschler's conduct grew worse. Mayo believed that Wheeler became less friendly toward him and met with his employees behind his back. The employees' testimony failed to support this belief.

## C. Mayo's Resignation

Mayo tendered a verbal resignation to Rentschler on May 14, 1994. Rentschler believed that Mayo was leaving for personal reasons. He discussed with Mayo his staying on for approximately one month so that a replacement could be found. Mayo agreed. Rentschler suggested that he put his resignation in writing. The written resignation indicated that Mayo's reason for leaving concerned criticisms of his performance and the undermining of his authority. Consequently, Rentschler contacted Wheeler, who made the decision, based on business reasons, to accept Mayo's resignation effective May 19, 1994, and to pay him through June 12, 1994.

Mayo claims that his decision to leave was based on the cumulative effect of the above incidents, which, Mayo claims, spanned a seventeen-month period. His physician told him that he was suffering from stress. He has experienced insomnia, prolonged indigestion, and hives brought on by stress.

## VI. Rumors and Speculation and Admissible Evidence

Mayo claims that various employees informed him that, because of the substance of his deposition testimony in the age-discrimination case, Rentschler and Wheeler were "out to get him," that he should "watch his back," and that Rentschler had begun the search for his replacement prior to his resignation. Kenwood provided evidence in the form of deposition testimony and affidavits that it did not provide the substance of Mayo's testimony in the age-discrimination case to the general board, Wheeler, Rentschler, or other Kenwood employees and, specifically, that neither Rentschler nor Wheeler knew the substance of Mayo's testimony.

Mayo claims that the trial court erred in not considering what the trial court defined as rumors and hearsay. In this case, the trial court was unclear exactly what testimony it considered to be rumors and hearsay. From our review of the record, we conclude that the trial court correctly did not consider rumors that Mayo should "watch his back" and that Wheeler and Rentschler were out to get him, spread by employees and based upon assumptions, as many of the comments were, because such rumors were inadmissible hearsay. Furthermore, the statements, allegedly made by Penwell and Kenwood's office manager, respectively, that Mayo would be gone and that he was on probation were also inadmissible hearsay. The statements were not vicarious admissions under Evid.R. 801(D)(2)(d), because they did not concern matters within the scope of the employment of the declarants. Idle speculation is not admissible evidence.

Contrary to the decision of the trial court, however, we conclude that Ronald Latchford's testimony of what he overheard Rentschler say is admissible as an admission by Kenwood under Evid.R. 801(D)(2)(d). Latchford, an ex-employee of Kenwood's, testified that after Mayo's deposition testimony in the age-discrimination case, he overheard Rentschler, on several occasions while speaking to the bar manager, say that he wanted to get rid of Mayo by "stressing him out," overworking him, and getting him to resign. He heard Rentschler say that he wanted Mayo gone, but that it would be hard to fire him. He told Mayo of these conversations only after Mayo had resigned.

Rentschler was an agent of Kenwood and his statement concerned a matter within the scope of his agency and was made during the existence of his relationship with Kenwood.[20] Rentschler was Mayo's supervisor and evaluated

---

20. See *Brock v. Gen. Elec. Co.* (1998), 125 Ohio App.3d 403, 708 N.E.2d 777; *Williams v. ITT Fin. Serv.* (June 25, 1997), Hamilton App. No. C–960234, unreported, 1997 WL 346137, affirmed *sub nom. Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 700 N.E.2d 859;

his job performance. Rentschler made the statement to another manager in the club while employed as Kenwood's manager. Thus, this statement was admissible.

## VII. Summary Judgment was Proper

What is somewhat unusual about this case is that Mayo has presented evidence to create a genuine issue of material fact as to the alleged intent of Kenwood through the statement of Rentschler. But that in and of itself does not defeat Kenwood's summary-judgment motion. While Kenwood may have wanted to force Mayo to quit, the question remains whether a reasonable person would have felt compelled to resign as the result of Rentschler's actions and whether an employer could reasonably foresee that the employee would.

Considering Mayo's allegations in a light most favorable to him, we conclude that Kenwood did not create conditions so intolerable that a reasonable person under the circumstances would have felt compelled to quit or that termination was imminent. Many jobs are stressful. Day-to-day rumor and innuendo in the workplace are common. When a manager is on the "hot seat" because of losses, those under him or her often feel the transferred heat. But in this case, though Mayo has presented a genuine issue of fact about whether he was treated as we would all wish to be treated, the knocks and jolts of his workplace did not rise to the level of constructive termination.

Because Mayo has failed to demonstrate a genuine issue of material fact about whether he was constructively discharged, he is precluded from proving his claims of either constructive retaliatory discharge or dismissal in violation public policy.

## VIII. Intentional Infliction of Emotional Distress

In Mayo's third assignment of error, he contends that the trial court wrongly granted summary judgment to Kenwood on his claim for intentional infliction of emotional distress. Mayo asserts that the conduct allegedly giving rise to his constructive discharge was intentionally inflicted upon him to cause him extreme emotional distress. He alleges that he suffered mental anguish, humiliation, embarrassment, and loss of enjoyment of life.

In order to recover on a claim of emotional distress, a plaintiff must demonstrate that "(1) the defendant intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was outrageous and extreme and beyond

---

*Holda v. Skilken Properties Co.* (Jan. 23, 1991), Richland App. No. CA–2768, unreported, 1991 WL 12813; *Hill v. Spiegel* (C.A.6, 1983), 708 F.2d 233.

all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it."[21]  Based on our review of the record as set forth above, we believe that Mayo has failed to raise a genuine issue of material fact as to whether Kenwood's conduct was outrageous, extreme, or intolerable.

Therefore, we overrule Mayo's third assignment of error, and, accordingly, we affirm the trial court's judgment in favor of Kenwood.

*Judgment affirmed.*

GORMAN, P.J., and SUNDERMANN, J., concur.

---

21. *Ekunsumi v. Cincinnati Restoration, Inc.* (1997), 120 Ohio App.3d 557, 562, 698 N.E.2d 503, 506.