OPINION
This timely appeal arises from the decision of the Mahoning County Court of Common Pleas finding Appellant guilty of aggravated murder in the death of Janina Thompson ("Thompson"). Appellant asserts that he entered into an agreement with the Juvenile Prosecutor's Office in which he was promised he would not be prosecuted and which he claims was not honored. For the following reasons, we must agree with Appellant.
On December 6, 1996, then seventeen-year-old Warren Stanley ("Appellant") attended a party held at the house of Tim Overton ("Overton"). Antjuan Adkins ("Adkins"), Darnell Clark, Jr. ("Clark") and Ed Blackmon ("Blackmon") were also present at the party, among others. All the partygoers consumed alcohol and smoked marijuana.
Thompson arrived a few hours after the party began and joined in the drinking and smoking. After becoming intoxicated, Thompson had sexual intercourse with several of the partygoers. Appellant, a former boyfriend of Thompson, entered the living room and saw Thompson engaging in intercourse with Clark. Soon after this encounter, Thompson left the house, either to walk to a local store or to her home. Appellant also left Overton's house in his current girlfriend's car along with Adkins, Blackmon and Clark. Appellant picked up Thompson a few blocks later. Appellant drove the car a few more blocks to Rose Court. Thompson exited the car at that location and was fatally shot in the neck with a .22 caliber handgun. After the first shot, someone else fired a second shot at Thompson using a 9mm handgun. The second bullet did not penetrate Thompson's heavy leather coat and did not enter her body. Appellant is accused of firing the first, fatal shot.
Not surprisingly, accounts of the evening vary widely between the living occupants in the car. Adkins testified that after Appellant broke up the consensual sex act between Thompson and Clark, Appellant hit Thompson in the face and argued with her. Adkins also testified that after the group picked up Thompson and drove to Rose Court, Appellant left the car and told Thompson to get out also. Adkins testified that after moving ten feet away from the car, Appellant pulled his .22 caliber handgun and shot Thompson in the back of the neck. Adkins admits that he fired his 9mm handgun at Thompson, "to finish off what [Appellant] was doing." (Tr. 289).
Adkins was initially charged with rape and murder in this case. He eventually pleaded guilty to felonious assault in exchange for his testimony against Appellant. Adkins declined to give a statement to the police prior to his plea bargain.
Clark declined to offer any information to the police after the incident. Clark is now deceased.
Blackmon testified that Thompson and Appellant exchanged punches to the face and engaged in a heated argument after Appellant broke up the sexual activity between Thompson and Clark and that Thompson left the party upset. Blackmon testified that the four men, including himself, left the house heading to Blackmon's girlfriend's house and picked up Thompson en route. Blackmon testified that Appellant's pager went off en route, indicating that Appellant was needed for a drug sale. Blackmon stated that Appellant quickly stopped the car, ordered Thompson out, and shot her with a .22 caliber pistol. He testified that Appellant remarked, "[s]he had to go," upon re-entering the car. (Tr. 154). Blackmon said that he originally told Youngstown Police detectives that Adkins shot Thompson so that Appellant would not have to go to jail. It was revealed that the Youngstown Police Department originally charged Blackmon with the aggravated murder and rape of Thompson. Blackmon entered into a plea agreement to drop all charges against him relating to the events of December 6, 1996, in exchange for his testimony against Appellant.
Appellant testified that he did nothing to stop Thompson's sexual acts with the partygoers and that they did not argue. He also testified that the group got in the car specifically to find Thompson and drive her home. Appellant testified that upon entering the car, Thompson began arguing with Adkins. Adkins asked him to stop the car so he could urinate. Appellant testified that Adkins, Blackmon and Thompson exited the car, and that he then heard two shots. Appellant testified he could not see what was going on because his view was blocked by sun shades on the side windows. Appellant also testified that, upon hearing the shots, he sped off leaving Adkins and Blackmon behind.
The only consistent testimony by the four was that they were all intoxicated and under the influence of marijuana at the time of the murder.
Appellant's initial statement to Youngstown police identified Blackmon as the shooter of the .22 caliber handgun. Prior to being indicted himself, Appellant agreed to testify against Blackmon. He did not arrive at court on the day of the preliminary hearing. Appellant claimed that he was threatened by others to prevent him from testifying. He was later picked up by the Youngstown Police Department on a material witness warrant.
On January 23, 1997, the Mahoning County Prosecutor's Office brought Appellant before Juvenile Court Judge McNally to determine whether Appellant should remain incarcerated on the material witness warrant. Appellant agreed to remain in custody until he could testify at a grand jury hearing. The Prosecutor's Office did not charge Appellant at that time. There are clear indications in the record that Appellant did testify against Blackmon and Adkins at later proceedings. (1/13/99 Tr. 8, 2/24/99 Tr. 447, 449).
On May 1, 1998, a juvenile complaint was filed against Appellant charging him with one count of aggravated murder. The case was transferred to the General Division of the Court of Common Pleas on May 22, 1998. The main impetus for charging Appellant was a statement by Adkins, in fulfillment of his plea bargain, which implicated Appellant rather than Blackmon as the person who fired the fatal shot. (2/24/99 Tr. 340, 342).
On October 21, 1998, Appellant filed a motion to dismiss the charges against him based on his allegation that, prior to the indictment, he had entered into an agreement with the Prosecutor's Office, Juvenile Division, that he would not be prosecuted. On January 13, 1999, a hearing on the motion was held before the trial court. On January 19, 1999, the Common Pleas Court overruled the motion, determining that either there was no enforceable agreement not to prosecute or that Appellant breached the agreement.
On January 27, 1999, Appellant filed an appeal of the January 19, 1999, Judgment Entry. The appeal was designated as App. No. 99-C.A.-27.
Appellant was tried by a jury on February 24, 1999. The jury found Appellant guilty of aggravated murder in violation of R.C. §2903.01(A)(D). On March 5, 1999, the court sentenced Appellant to life imprisonment with parole eligibility after twenty years, with an additional three years for the gun specification.
That same day, Appellant again filed an appeal. The appeal was designated as App. No. 99-C.A.-55. This Court subsequently merged the two appeals under App. No. 99-C.A.-55, and dismissed the earlier appeal for reporting purposes.
Appellant asserts three assignments of error in this appeal. His first assignment of error states:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DETERMINING THAT APPELLANTBREACHED [SIC] THE PROSECUTORS AGREEMENT OF IMMUNITY."
Appellant argues that he entered into a non-prosecution agreement with former juvenile prosecutor Donna McCollum ("Pros. McCollum") prior to being charged with any crime relating to the events of December 6, 1996. The agreement, according to Appellant, was that no charges would be filed against him if he cooperated with police and if he would testify against Blackmon and Adkins.
Appellant relies on the record of the January 13, 1999, Motion to Dismiss hearing as evidence of the agreement. Pros. McCollum testified that:
 "[w]e had reached an agreement. Again, whether I spoke directly with Mr. Stanley or through detectives, I am not sure. * * * We had reached an agreement that he had given a statement to the Youngstown Police Department. They were relying on that statement, felt that was the factual basis for the offense that had occurred, and in exchange for that we had agreed not to prosecute him for any other charges, be it obstruction of justice, whatever we would have done, in exchange for his testimony in the trials of the co-defendants or the people actually charged." (1/13/99 Tr. 6-7).
 Pros. McCollum also testified that she believed that Appellant did testify in fulfillment of the agreement:
 "Q. [Appellant's attorney:] You believed that [Appellant] would testify to the fact that Edward Blackmon and Antjuan Adkins were the actual murderers of Janina Thompson; is that correct?
 "A. [Atty. McCollum:] He was going to testify to the statement that he had given at that time, yes.
 "Q. And the statement that he had given to the police at that time, he was going to testify to that; correct?
"A. Yes.
 "Q. And to the best of your knowledge, did he testify to that?
"A. I believe he did." (1/13/99 Tr. 8).
Assistant Mahoning County Prosecutor Lori Shells ("Pros. Shells") testified at the hearing on the motion to dismiss about the events that occurred at a previous juvenile hearing on January 23, 1997. The juvenile hearing was called to evaluate Appellant's continued detention after he was arrested pursuant to the material witness warrant. Pros. Shells testified that at the time of the juvenile hearing, statements were made that, "there would be no charges filed against Mr. Stanley." (1/13/99 Tr. 21). Pros. Shells stated that, "my understanding was that [Appellant] was going to be a witness at that time to the police department." (1/13/99 Tr. 21).
Detective Gerald Maietta ("Det. Maietta"), who was a witness at both the January 23, 1997, juvenile hearing and the January 13, 1999, motion to dismiss hearing, testified that it was his understanding that Pros. McCollum had entered into a non-prosecution agreement with Appellant. (1/13/99 Tr. 39-40). Appellant's attorney questioned Det. Maietta as follows:
 "Q. Was it your understanding that [Appellant] had made what we call a Rule 11 agreement that if he testified and cooperated with you fully, that he would not be charged in the murder of Janina Thompson?
"A. [Det. Maietta:] Yes, it was.
"* * *
 "Q. To the best of your knowledge, did [Appellant] comply with the agreement?
"A. Yes."(1/13/99 Tr. 42-43).
Attorney John Shultz ("Atty. Shultz") testified that he was appointed to represent Appellant at the January 23, 1997, juvenile hearing. (1/13/99 Tr. 25). Atty. Shultz testified that he was appointed primarily to memorialize the terms of a prior non-prosecution agreement. (1/13/99 Tr. 26-27). Atty. Shultz's understanding of the agreement was that, "if [Appellant] would cooperate with law enforcement then not only would he been [sic] released he would not be charged in this matter." (1/13/99 Tr. 26-27).
Finally, the record indicates that the juvenile court itself, at the January 23, 1997, hearing, acknowledged that there was an agreement: "You were subpoenaed. You failed to appear after, I guess, having agreed to appear and cooperate. At this point you would be — you would remain held pursuant to your agreement * * *." (1/23/97 Tr. 7).
After hearing all the aforementioned evidence as to what took place at the juvenile court level, the trial court overruled Appellant's motion to dismiss for three reasons: 1) no court approved the non-prosecution agreement; 2) the agreement was not memorialized in the record; and 3) Appellant was less than truthful in his testimony, which was a breach of the agreement and which rendered the agreement unenforceable. (1/13/99 Tr. 50-52). The first and third reasons offered by the trial court involve both factual determinations made by the trial court as well as legal issues. Issues of law are reviewed de novo on appeal. NationwideMut. Fire Ins. Co. v. Guman Bros. Farm (1995), 73 Ohio St.3d 107, 108,652 N.E.2d 684. We must defer to the evidentiary findings of the trier of fact if those findings are supported by competent, credible evidence in the record. State v. Williams (1986), 23 Ohio St.3d 16, 19, 490 N.E.2d 906;State v. Rossiter (1993), 88 Ohio App.3d 162, 166, 623 N.E.2d 645. The second reason offered by the trial court presents a factual issue which is not in dispute, as well as an issue of law.
Any error made by the trial court will be disregarded unless it is prejudicial error affecting Appellant's substantial rights. Crim.R. 52(A). It is obvious, though, that Appellant would be prejudiced by an erroneous decision involving an agreement not to prosecute. A subsequent fair trial does not undo the harm of erroneously failing to uphold a non-prosecution agreement, because in such cases, "it is the violation of `the right not to be haled into court at all * * * [which] operated to deny [the defendant] due process of law.'" People v. Smith (Ill.App. 3d 1992), 599 N.E.2d 492, 497, quoting Blackledge v. Perry (1974),417 U.S. 21, 30-31, 94 S.Ct. 2098, 40 L.Ed.2d 628.
Before addressing the trial court's reasons for overruling Appellant's motion to dismiss, we must clarify the nature of the alleged non-prosecution agreement in dispute, here. There are three basic types of non-prosecution agreements. The first is a negotiated plea agreement, typically called a plea bargain, which is allowed pursuant to Crim.R. 11. Crim.R. 11(F) recognizes the use of negotiated plea agreements in felony cases and requires that the agreement be stated on the record in open court. Crim.R. 11 presumes that the suspect has already been charged with one or more crimes and will plead guilty or no contest to at least one offense. The trial court has the discretion to accept or reject a negotiated Crim.R. 11 plea, and the agreement is not binding until accepted by the court. State v. Ridgeway (1990), 66 Ohio App.3d 270,276-277, 583 N.E.2d 1123; Crim.R. 11(C)(2), (D). A plea bargain is a contract and is governed by contract law principles and standards. Statev. Butts (1996), 112 Ohio App.3d 683, 686, 679 N.E.2d 1170; Baker v.United States (C.A.6, 1986), 781 F.2d 85, 90; Santobello v. New York
(1971), 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427.
The second type of non-prosecution agreement is a grant of immunity pursuant to R.C. § 2945.44:
 "(A) In any criminal proceeding in this state or in any criminal or civil proceeding brought pursuant to sections 2923.31 to 2923.36 of the Revised Code, if a witness refuses to answer or produce information on the basis of his privilege against self-incrimination, the court of common pleas of the county in which the proceeding is being held, unless it finds that to do so would not further the administration of justice, shall compel the witness to answer or produce the information, if both of the following apply:
 "(1) The prosecuting attorney of the county in which the proceedings are being held makes a written request to the court of common pleas to order the witness to answer or produce the information, notwithstanding his claim of privilege;
 "(2) The court of common pleas informs the witness that by answering, or producing the information he will receive immunity under division (B) of this section.
 "(B) If, but for this section, the witness would have been privileged to withhold an answer or any information given in any criminal proceeding, and he complies with an order under division (A) of this section compelling him to give an answer or produce any information, he shall not be prosecuted or subjected to any criminal penalty in the courts of this state for or on account of any transaction or matter concerning which, in compliance with the order, he gave an answer or produced any information."
Statutory immunity can become an issue only after: 1) a witness invokes his or her Fifth Amendment right against self-incrimination and refuses to testify; and 2) the prosecutor has made a written request to the court to compel the witness to testify. R.C. § 2945.44(A). The trial court must then determine whether the right against self-incrimination has been validly asserted and whether the witness should be compelled to testify. State v. Reiner (2000), 89 Ohio St.3d 342, 355, 731 N.E.2d 662, reversed on other grounds, 532 U.S. 17, 121, S.Ct. 1252,149 L.Ed.2d 158. The grant of statutory immunity is not actually in the nature of a bargain, because it only arises when a witness is compelled to testify.State v. Adamson (1998), 83 Ohio St.3d 248, 251, 699 N.E.2d 478. Statutory immunity bars prosecution whether or not the witness fulfilled the terms of any agreement with the prosecutor, as long as the statutory elements have been followed. Id. at 251-252.
A third type of prosecutorial agreement exists when a suspect agrees to provide truthful information about a crime on the condition that he or she will not be prosecuted at all. State v. Small (1987), 41 Ohio App.3d 252,255, 535 N.E.2d 352 (for a full discussion of miscellaneous non-prosecution agreements, see Butler v. State (1983), 55 Md. App. 409,462 A.2d 1230). The prosecutor's power to enter into non-prosecution agreements arises, in part, from the discretion a prosecutor has in initiating a criminal prosecution. Mootispaw v. Eckstein (1996),76 Ohio St.3d 383, 385, 667 N.E.2d 1197. Non-prosecution agreements made before criminal proceedings are initiated are not subject to court approval because, "the decision whether to prosecute is discretionary and not normally subject to judicial review." Id. Pre-indictment agreements do not arise out of the Ohio Rules of Criminal Procedure or out of the immunity statute, and they are not subject to requirements of Crim.R. 11 or R.C. § 2945.44. In contrast, non-prosecution agreements which arise after there has been an indictment are subject to court approval. Crim.R. 48(A); R.C. § 2941.33.
We must also acknowledge in this discussion that, "the promise of a state official in his public capacity is a pledge of the public faith and is not to be lightly disregarded. The public justifiably expects the State, above all others, to keep its bond." Bowers v. State (Ind. 1986), 500 N.E.2d 203, 204; cf. Santobello, supra, 404 U.S. at 262,92 S.Ct. 495, 30 L.Ed.2d 427.
Pre-indictment agreements not to prosecute are bargained-for in the same way as Crim.R. 11 plea bargains, and are subject to review under the same contract law principles. United States v. Wood (C.A. 11, 1986),780 F.2d 929. If the agreement is conditioned upon a defendant's testimony, the defendant's failure to testify nullifies the government's promise not to prosecute. Id.; Small, supra, 41 Ohio App.3d at 255,535 N.E.2d 352. The question of the defendant's breach of the agreement, and by implication, the question of the very existence of the agreement, is subject to judicial review by way of an evidentiary hearing. Id.;Butler, supra, 55 Md. App. at 433-439, 462 A.2d 1230.
It is clear that Appellant is alleging that he entered into a pre-indictment prosecutorial bargain, rather than a Crim.R. 11 plea bargain or statutory immunity order. Appellant argues that the agreement was entered into before he was ever suspected of committing the crime in question. Appellant raised the issue of the pre-indictment agreement as an affirmative defense in his criminal case. The burden of going forward with an affirmative defense, and the ultimate burden of proof by a preponderance of the evidence, are on the accused. R.C. § 2502.05(B).
Appellant's motion to dismiss was, in effect, a request for specific performance of the agreement not to prosecute. An action in specific performance requires a contract which is valid and mutually binding upon the parties to the contract. Bretz v. The Union Central Life Ins. Co. (1938), 134 Ohio St. 171, 177, 16 N.E.2d 272. Specific performance will not be decreed absent such a contract. Id. The contract must be complete and definite in its material terms and certain enough that, "no reasonable doubt as to what the parties intended," lingers in the mind of the court. The Lindner Co. v. The Myrod Shoe Co. (1930), 38 Ohio App. 183,200-201, 175 N.E. 879.
In order to resolve the matter, we must first review the three reasons given by the trial court for not enforcing the alleged non-prosecution agreement. Because of the facts presented here, the trial court's first conclusion that any non-prosecution agreement would not be enforceable because it was not approved by the court is incorrect. Although the court is required to approve both Crim.R. 11 and statutory immunity agreements, as well as post-indictment agreements not to prosecute, there is no requirement or even opportunity for a court to approve a pre-indictment agreement not to prosecute. The well-established rule is that the prosecutor has the sole discretion in determining whether to initiate criminal charges. This rule is incompatible with any procedure in which the court has final approval over a prosecutor's decision not to initiate a criminal prosecution. State ex rel. Master v. Cleveland
(1996), 75 Ohio St.3d 23, 27, 661 N.E.2d 180; State ex rel. Murr v.Meyer (1987), 34 Ohio St.3d 46, 47, 516 N.E.2d 234.
The trial court's second conclusion that the agreement was unenforceable because it was not memorialized is also misplaced. While a Crim.R. 11(F) negotiated felony plea must be made on the record in open court and a R.C. § 2945.44 immunity request must be in writing, there are no such requirements for pre-indictment agreements not to prosecute. The law of contracts, which includes the law of oral contracts, governs non-prosecution agreements under these circumstances. See State v.Crosby (Apr. 25, 1995), 5th Dist. No. 93-CA-57, affirmed after remand by (Apr. 8, 1997), 5th Dist. No. 96-CA-98. An oral contract, by its very nature, is not memorialized. Testimonial evidence alone may be sufficient to support the existence of an oral contract. McSweeney v. Jackson
(1996), 117 Ohio App.3d 623, 632, 691 N.E.2d 303.
Finally, the trial court's third conclusion that Appellant breached the agreement by being less than truthful in his testimony is unsupported by the record. The transcript of the January 13, 1999, motion to dismiss hearing does reflect the State's speculation that Appellant lied. (Tr. 12-17). No evidence or testimony was introduced to support this speculation. The record does not reveal Appellant's specific testimony against Blackmon and Adkins. The record also does not contain the details of Appellant's original statement to the police. A prosecutor's idle speculation that Appellant may have lied does not constitute any competent or credible evidence of Appellant's breach of the agreement not to prosecute. State v. Murphy (1990), 49 Ohio St.3d 206, 212, 551 N.E.2d 932; see also Mayo v. Kenwood Country Club, Inc. (1999), 134 Ohio App.3d 336,345, 731 N.E.2d 190.
Based on the above, the trial court's stated reasons for failing to grant Appellant's motion to dismiss do not support such decision. It is unquestioned that the court was faced with a situation where the record could have been made more clearly and the end result of granting the accused's motion would leave not one of the four persons somehow involved with the murder of Ms. Taylor to be held accountable for her death. Further, it is abundantly apparent on the record that certain changes took place within the prosecutor's office in early 1997. Not only did the assigned juvenile division prosecutor change, but clearly there was no cooperation in this matter during or after such administrative changes. Adding to the confused state of the record, Appellant has not been represented by the same counsel throughout these proceedings. Nevertheless, since we have determined that none of the three reasons advanced by the trial court prevents Appellant's requested relief, we must now determine whether, based on the record as a whole, Appellant was actually entitled his affirmative defense and thus to have his motion to dismiss granted.
Just as there is no evidence in the record that Appellant lied, there is no direct evidence as to what it was Appellant was asked to do and the extent of his compliance. Appellant's claims must be traced back through several transcripts and pieced together. As earlier stated, both Pros. McCollum and Det. Maietta testified that there was an agreement not to charge Appellant with a crime in this matter in exchange for some testimony against one or several of the other men involved. Both indicated that such an agreement was not written and, in fact, would not be written. To the best of their knowledge, such a practice was still occurring in Juvenile Court at the time of the hearing on the motion to dismiss. Not only was this testimony unrebutted, this information was supported at that time by the testimony of then-current Pros. Shells.
In addition to this testimony, the record contains a transcript of the juvenile court hearing on January 23, 1997. It is apparent in the record that Appellant was only being held as a material witness to the incident involved here. While no party to the hearing put the exact agreement into the record, the judge clearly stated that an agreement existed and that Appellant should be held in custody so that he could testify before the next grand jury, pursuant to that agreement (1/13/99 Motion to Dismiss, Exh. C, Tr. 7, 9). At that hearing, the judge noted that Appellant apparently violated at least a portion of the agreement by fleeing the jurisdiction and failing to appear. The judge asks Appellant his reasons for doing so, and Appellant responded that he was in fear for his life. At that juncture, the court could have declared that any and all agreements were invalid, if that was the case. Instead, the judge explicitly states:
 "THE COURT: Okay. I'm just going to indicate that counsel and subject child have appeared, agreed then to appear before the Grand Jury and testify within two weeks and that, likewise, agrees to remain detained at this point for his own protection and safety until the testimony is provided, and thereafter he will be released from detention to relatives in an out-of-town location. He'll inform you of that location and I'll make that part of the record, and thereafter, you will be subject to further subpoenas and testimony. Do you have any questions about it now? Do you fully understand what we are doing here?
"MR. STANLEY: Yeah. I understand.
"THE COURT: Okay. I just want to make sure.
"MR. SHULTZ: Okay. Thank you, Your Honor.
 "THE COURT: You know you are not being charged. If you have any questions you contact Attorney Shultz; okay?"
(Id. Tr. 9).
"MR. STANLEY: Okay.
 "THE COURT: But you are being detained for reasons other than having committed a crime.
"MR. STANLEY: I got it.
 "THE COURT: Okay. Then he can be returned to detention." (Id. Tr. 10).
Pros. Shells was present at this hearing and did not object or attempt to interject to the court that no agreement had been reached or that the judge misunderstood or misspoke as to the terms of the agreement.
By all accounts, Appellant did appear and testify at the grand jury hearing. It is apparent that Appellant was not asked to testify at any trial because the charges against the other suspects were either dropped or reduced through plea bargaining. The only trial actually held was his own. We are left with the disturbing situation where one or more prosecutors made a non-prosecution agreement, a juvenile court judge acknowledged that agreement, a juvenile witness testified in reliance upon that agreement, and a subsequent prosecutor repudiated or ignored that agreement and charged Appellant with a crime.
The judge of the Mahoning County Court of Common Pleas, Juvenile Division, has the same powers as the other common pleas court judges in that county. R.C. § 2301.03(E)(2). The juvenile court judge had the opportunity to clarify the confusion surrounding the non-prosecution agreement in 1997, but did not. Instead, the juvenile court judge essentially ratified and endorsed the agreement by ordering Appellant to take certain actions in reliance on the existence of an agreement. Once the matter was raised in yet another division of the common pleas court, before a judge admittedly possessing the same power and authority as the juvenile court judge, it was inconsistent at best for that agreement to be effectively negated, especially after it was endorsed by the juvenile judge.
The juvenile court has exclusive and original jurisdiction over all juvenile delinquency cases. R.C. § 2151.23(A)(1). A child who commits an act that would be a crime if committed by an adult is subject to the juvenile delinquency statutes. R.C. § 2151.02. A juvenile cannot be subject to the adult criminal division of the court of common pleas until the juvenile case is properly transferred to that division. R.C. §2151.26. Until that transfer takes place, it would appear that the juvenile prosecutor has the authority to enter into agreements not to prosecute with those persons subject to the jurisdiction of the juvenile court. Pros. McCollum was not, herself, the Mahoning County Prosecutor. She was one of many assistants. However, Appellee does not argue or suggest that Pros. McCollum did not have the authority to enter into the non-prosecution agreement at issue, and the statutory law certainly supports that McCollum did have that authority. In any event, her testimony as to the events which transpired went totally unrebutted in the motion hearing.
In our review, we are left with the question as to whether there was any competent and credible evidence to support the decision not to dismiss the charges against Appellant. We must conclude, albeit reluctantly, that there was not. As earlier discussed, the parties who would have known about the non-prosecution agreement testified on January 13, 1999, that there was such an agreement. Pros. McCollum's testimony presents the most telling evidence, because it was she who apparently initiated the agreement. The testimony of Det. Maietta and Atty. Shultz completely corroborated Pros. McCollum's testimony. Appellee presented no evidence to rebut this testimony. Appellee did not attempt to impeach or discredit these witnesses. Appellee did not attempt to prove that juvenile prosecutors did not or could not enter into oral non-prosecution agreements. In fact, Pros. Shells testified that juvenile non-prosecution agreements were not required to be put in writing until 1998-1999, after Appellant had already entered into the oral agreement at issue in this case. (1/13/99 Tr. 22-23). The record reveals that the juvenile court judge at the time acknowledged that there was an agreement, generally laying out its terms, and ordered Appellant to act in reliance upon that agreement. Finally, there was unrebutted testimony that Appellant complied to the best of his ability with the agreement.
All of the actual evidence in the record appears to support Appellant's motion to dismiss. In so holding we recognize, as it is apparent the trial court also recognized, conflicting policies at work. First, there is the need to determine and punish those who admit to being involved in crimes, particularly one as heinous as presented here. There is also a need to uphold the public trust in the sanctity of promises made by state officers in their official capacity, particularly when those promises are tacitly endorsed in a court order. In so doing, we must note that we are not ruling as to whether entering into such an agreement was the wisest course of action nor the course the trial court or this Court would have chosen. While we are disturbed at the manner in which this matter was handled, we are left with no choice from the record before us other than to sustain Appellant's first assignment of error. Appellant's motion to dismiss on the basis that he had a valid non-prosecution agreement should be upheld and the charges against Appellant should have been dismissed. Thus, Appellant should not have been forced to answer to these at trial and his conviction must be dismissed.
Appellant's second and third assignments of error state:
 "THE APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 "THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR AN [SIC] IMPARTIAL TRIAL DUE TO CLOSING STATEMENTS MADE BY THE PROSECUTION."
These assignments of error are both rendered moot by our resolution of Appellant's first assignment of error.
 CONCLUSION
For all the foregoing reasons, we must sustain Appellant's first assignment of error. The January 19, 1999, Judgment Entry of the Mahoning County Court of Common Pleas is reversed, and the charges contained in the June 22, 1998, indictment must be hereby dismissed and Appellant discharged. We dismiss Appellant's second and third assignments of error as moot.
Donofrio, J., concurs.
DeGenaro, J., concurs; see concurring opinion.